505 S.E.2d 442

**Jack NOBLES, et al., Appellees,**

**v.**

**William C. DUNCIL, Warden, Huttonsville Correctional Center, et al., Appellants.**

**No. 24748.**

Supreme Court of Appeals of West Virginia.

Submitted June 3, 1998.

Decided July 8, 1998.

**526**

Daniel F. Hedges, Mountain State Justice Inc., Charleston, for Appellees.

Darrell V. McGraw, Jr., Attorney General, Rita A. Pauley, Special Assistant Attorney General, Charleston, for Appellants.

MAYNARD, Justice:

The appellants (respondents below), William C. Duncil, Warden, Huttonsville Correctional Center, et al., appeal two provisions of the December 26, 1996 final order of the Circuit Court of Randolph County directing the appellants to correct certain conditions at the Huttonsville facility found by the circuit court to violate constitutional standards. Specifically, the appellants assert the circuit court erred in requiring the appellants to contract with a person outside the Division of Corrections to conduct inmate disciplinary hearings, in ordering that future contracts for outside inmate medical services provide for a per incident threshold not to exceed five hundred dollars, and by exceeding its authority in a mandamus action by prescribing how prison officials are to carry out their discretionary duties. For the reasons set forth below, we agree with the appellants. Accordingly, we reverse the circuit court's order as to these two provisions and affirm the remaining provisions of the order.[1]

## I.

### FACTS

This case concerns conditions that existed at the Huttonsville Correctional Center ("Huttonsville") located in Huttonsville, West Virginia. Huttonsville is a medium security facility under the jurisdiction and control of the Secretary of the Department of Military Affairs and Public Safety and the Commissioner of the Division of Corrections.[2] The warden is the chief executive officer charged with overall management of the facility subject to the oversight of the Secretary and the Commissioner.[3]

In July 1983, the appellees (petitioners below), five inmates at Huttonsville,[4] petitioned this Court for a writ of mandamus challenging certain conditions at that facility which, they alleged, violated their constitu-

---

1. The remaining provisions of the final order are not challenged by the appellants and will not be discussed in this opinion.

2. *See* W.Va.Code § 28–5A–2 (1970) and W.Va.Code § 5F–2–1(e)(7) (1997).

3. *See* W.Va.Code § 28–5A–3 (1970).

4. The petitioners were Jack Nobles, Joseph L. Bryant, John Trent Wiggin, John E. Wilson and Tim Forrester. The original mandamus action was brought against Ronald D. Gregory, Warden, Huttonsville Correctional Center, and W. Joseph McCoy, Commissioner, West Virginia Department of Corrections.

tional and statutory rights. This Court issued a rule of mandamus returnable to the Circuit Court of Randolph County and appointed the Honorable Larry V. Starcher as Special Judge.[5]

Following an evidentiary hearing conducted over a period of several days, the circuit court entered a memorandum order in which it found that several conditions at Huttonsville fell below standards guaranteed by the Constitution of West Virginia. Specifically, the circuit court found in part:

As will be stated more explicitly, the evidence in this case demonstrates clearly and convincingly that the inmates at Huttonsville exist under conditions which fall below recognized constitutional and professional standards. This is true despite the previously mentioned commendable efforts by the Warden and his staff to maintain the aging facility and administer a meaningful rehabilitation program on a woefully inadequate budget. The present state of the Center is probably the inevitable result of years of legislatively imposed austerity. Nevertheless, the following conditions exist and must be corrected:

—Overcrowding and exposure to personal assaults;

—Unsanitary and unhealthful quarters;

—Inadequate conditions of segregation;

—Inadequate health care;

—Improper disciplinary procedures;

—Inadequate communications and visitation policies and facilities;

—Limited legal access;

—Unsanitary kitchen facilities and a lack of properly trained kitchen staff;

—Improper administration of inmate accounts and "good time"; and an

—Absence of adeqaute [sic] educational or vocational rehabilitation opportunities.[6]

From 1985 to 1996, Judge Starcher maintained a hands on approach to the operation and improvement of Huttonsville. This included holding one or two enforcement hearings per year to ensure implementation of the circuit court's orders during this time. Both parties agree that this process brought very positive and tremendous change to Huttonsville. Judge Starcher's careful and judicious conduct of this litigation over many years directly resulted in dramatic and much needed reforms in the conditions at Huttonsville. In fact, Judge Starcher's management of this case caused a total metamorphosis in both conditions and attitudes at Huttonsville. This process culminated with the final order of December 26, 1996. The two provisions of that order now challenged by the appellants are as follows:

1. *Medical Services.* Since the inception of this Court Order there have been continued allegations raised in testimony before this Court on the issue of access to outside major medical services and the denial thereof. The current payment mechanism through contract with Correctional Medical Services ("CMS") incorporates a $5,000 threshold, that is, CMS must pay the first $5,000 of any outside medical service provided. Such $5,000 per incident payment constitutes the major non-fixed portion of the cost of the contract (salaries, supplies, administrative expenses and the like are fixed), which might be a fiscal incentive to the contractee [sic] to (1) discourage needed follow-up care from specialists, (2) refuse to use specialists who insist on quality care for their patents [sic], inmates or not, (3) delay needed rehabilitative medical care (legally required but possible to delay inmate access until discharge). This threshold appears as the Achilles heel of the HCC medical program.

Therefore, the Court ORDERS that the Division of Corrections shall not in future contracts for medical services at Huttons-

---

5. The Honorable Larry V. Starcher, Justice of the Supreme Court of Appeals of West Virginia, deemed himself disqualified in this proceeding. Accordingly, the Honorable Darrell Pratt, Judge of the Circuit Court of Wayne County, was designated to preside as a member of the Supreme Court of Appeals of West Virginia in this proceeding.

6. Clarence White, Warden, Huttonsville Correctional Center, and A.V. Dodrill, Commissioner, West Virginia Department of Corrections petitioned this Court for an appeal of this order which was refused by order of May 8, 1986.

ville Correctional Center provide for a per incident threshold that exceeds $500;

2. *Magistrate Hearing Process.* Petitioners contend that the magistrate is not an independent decision maker at Huttonsville Correctional Center. This Court found after hearing on or about January 2, 1992, that:

> A fair and impartial decision maker is at the core of an effective disciplinary process, and for it to be implemented effectively the hearing officer must be able to make decisions totally independent of the staff of the facility.
>
> The Court finds that the use of personnel having superior officers at the facility or persons having close relationships with officers at the facility does not result in fair and impartial decision making, sufficient to provide due process of law. . . .
>
> The Court thereupon ORDERS petitioners' and respondents' counsel to suggest to the Court methods of selection and that will assure the requisite independence.
>
> While the Court is quite cautions [sic] in requiring matters which result in a financial burden on the institution, this issue must either be satisfactorily resolved by the institution in the very near future or face the likelihood that the Court *will* appoint an independent magistrate.
>
> The Court is still of the opinion that there are fairness and independence problems associated with the magistrate hearing process at Huttonsville Correctional Center and consistent with the need to provide a fair and economical system.
>
> Therefore, the Court ORDERS the Division of Corrections to contract with a person to conduct the hearings who shall in no way be subject to any supervision, correction or control inside the Division of Corrections other than the Commissioner, shall not be subject to termination by the Commissioner except for gross misconduct or malfeasance in office, and which person shall not maintain an office inside a correctional facility. Said change in the magistrate system shall be made by January 1, 1998[.]

## II.

## STANDARD OF REVIEW

Ordinarily, our standard of review of a circuit court's order granting relief through the writ of mandamus is *de novo*. *See* Syllabus Point 1, *Staten v. Dean*, 195 W.Va. 57, 464 S.E.2d 576 (1995). This standard is applicable to cases where the circuit court's decision to grant the writ was based on the following analysis:

> A writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy.

Syllabus Point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). Here, however, the underlying case began as an original jurisdiction action in this Court pursuant to Rule 14 of the *West Virginia Rules of Appellate Procedure* and was referred to the circuit court. Because the circuit court conducted evidentiary hearings and made extensive findings of fact and conclusions of law, we find it appropriate here to follow the usual standards of review used by this Court in various kinds of cases. "That the original proceeding was based upon petitions for writs of mandamus does not require us to change our standards of review." *State ex rel Cooper v. Caperton*, 196 W.Va. 208, 213, 470 S.E.2d 162, 167 (1996). Accordingly,

> [i]n reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*Phillips v. Fox*, 193 W.Va. 657, 661, 458 S.E.2d 327, 331 (1995) (citation omitted); *see also* Syllabus Point 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996); and Syllabus Point 2, *Walker v. West Virginia*

*Ethics Com'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997). With this in mind, we now consider the issues before us.

## III.

## DISCUSSION

### A.

### *A Brief History*

Unfortunately, this Court has been called upon numerous times to deal with problems involving the Huttonsville Correctional Center. A brief review of these problems is helpful not only to an understanding of that facility's troubled past but also to a full appreciation of the extent to which Judge Starcher's efforts brought positive change to that institution.

In *Harrah v. Leverette,* 165 W.Va. 665, 271 S.E.2d 322 (1980), inmates at Huttonsville sought unconditional release from confinement because they were deprived of their federal and state constitutional rights to due process and freedom from cruel and unusual punishment following a riot at the prison on Labor Day weekend, 1978. This Court described in vivid terms some of the nightmarish conditions that ensued at Huttonsville at that time.

> [A] "riot squad", composed of correctional officers and other employees, increased disciplinary activities. Guards were dressed in full riot gear with helmets, shields, gas masks, riot batons, and tear gas. An attack dog named Gus was employed to frighten inmates and tear gas was used. Several injured prisoners were treated at the infirmary for tear gas irritation, nerves, kidney problems, and cuts and bruises.... In addition to night-time harassment by turning on lights, shouting, abusing and waking prisoners, guards entered dorms to "rough-up" inmates.

*Harrah,* 165 W.Va. at 668, 271 S.E.2d at 325. Also, inmates

> ran through a gauntlet of guards and were pushed, shoved, and gouged by riot sticks as they were moving. They were forced to stand spread-eagle against a wall while waiting to be interrogated. The guards subjected them to physical and verbal

abuse and hit them on the legs and back with four to five-foot long riot sticks. Many groups of inmates were forced to crawl like pigs or dogs, grunting or barking, to amuse guards; do calisthenics; or stand or sit without moving against a wall for hours. Inmates were dragged by the hair and spat upon. Threats and coercion were used to force them to confess about their own and other inmates' involvement in the disturbance. Several inmates testified that they saw guards hit other inmates between the legs with riot sticks.

*Harrah,* 165 W.Va. at 669, 271 S.E.2d at 326. In response to finding such cruel and unusual punishment that "shocks our consciences and offends our sensibilities," *id.,* 165 W.Va. at 679, 271 S.E.2d at 330, this Court took several steps, short of the unconditional release of inmates, designed to improve prison conditions and bring them in line with constitutional guarantees.

*Reed v. Hansbarger,* 173 W.Va. 258, 314 S.E.2d 616 (1984) involved a mandamus action brought by inmates at Huttonsville after the Thanksgiving food poisoning of a substantial number of inmates on November 24, 1983. This Court stated:

> This recent food poisoning incident, however, is but one in a long history of repeated health and sanitation violations at Huttonsville over the last six years. Violations over this time period include the improper storage of perishable and potentially hazardous food; the serving of outdated food; food contaminated by rodents, insects, and maggots; uncovered food prepared days in advance; infestation of the food service facility by rats, mice, cockroaches, and flies; handling of food by sick inmates; and leaking sewage.

*Reed,* 173 W.Va. at 259, 314 S.E.2d at 617. The Court granted the writ of mandamus compelling the respondents to enforce the applicable sections of the *West Virginia Board of Health Food Service Sanitation Rules.* The fact that Huttonsville is now a different institution from that described above is due in large measure to Judge Starcher's efforts in addressing the problems raised by the appellees in the underlying action.

## B.

*Issue No. 1: An Impartial Magistrate*

In the instant case, the appellants acknowledge that "[m]uch to the credit of the court as well as the parties, Huttonsville now meets and often exceeds minimal constitutional standards." Nevertheless, they seek partial relief from the circuit court's final order. First, the appellants assert that the circuit court erred in requiring them to contract with a person outside the Division of Corrections to conduct inmate disciplinary hearings and in prohibiting that person from having an office in any correctional center where there was no showing that the current system failed to provide a fair and impartial hearing officer.[7] Essentially, the appellants contend that this requirement is without legal precedent and unjustified by the facts.

To begin with, the appellants emphasize the adequacy of the disciplinary process in place at the time of the final order. This process, referred to as Policy Directive 670.00 and developed in 1983, established specific offenses, the range of punishment appropriate for each class of offenses, pre-hearing due process requirements, hearing procedures, and an independent magistrate system. Specifically, section 5.09 of the directive provides for disqualification of a magistrate under the following circumstances:

a. He/she has witnessed the incident, or filed an Incident Report.

b. He/she has participated in any investigation of the incident, or

c. He/she has any personal interest in the outcome of the case.

Whenever the Magistrate disqualifies himself/herself or is disqualified by the Executive Officer for any of the above reasons, the Director of the Corrections Academy, shall designate a substitute Magistrate to consider the particular case.

According to the appellants, this particular directive was approved by this Court in *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986), and a refined directive was later approved by the Court in *Crain v. Bordenkircher*, 191 W.Va. 583, 447 S.E.2d 275 (1994). The appellants claim that this policy directive meets the requirements set forth by the circuit court in its Memorandum Order which states that the disciplinary hearing "shall be before an impartial hearing panel or officer not previously involved in the matter." Further, it meets the due process requirement for disciplinary hearings in state prisons established by this Court in Syllabus Point 2 of *Harrah, supra*. Finally, it meets the minimum due process requirement for disciplinary hearings articulated by the United States Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The appellants also allege a paucity of evidence in the record supporting the circuit court's order.

In response, the appellees aver that the circuit court's finding on this issue is based on extensive evidence presented at the original evidentiary hearing as well as four other hearings. According to the appellees, this included evidence that a hearing officer was related to three correctional officers at Huttonsville, other problems related to similar close relationships, and constant discussions and sharing of information during coffee breaks. Further, the appellees state that the circuit court's order on this issue is based on the due process requirements found in *Harrah*. The appellees conclude that the appellants' have failed to meet their burden of showing that the circuit court's judgment was plainly wrong. *Citing* Syllabus Point 6, *Mahoney v. Walter*, 157 W.Va. 882, 205 S.E.2d 692 (1974); Syllabus Point 5, *Morgan*

---

7. Concerning how the magistrate system worked as of the date of the final order, the *Huttonsville Correctional Center Rules and Regulations*, pp. 39–40 (Reprinted October 1990), issued by the West Virginia Division of Corrections and contained in the record states:

 **2.04 "Correctional Magistrate"** shall refer to the office of Magistrate which shall be created at West Virginia Penitentiary, Huttonsville Correctional Center, Anthony Center, Prunytown Cor-

rectional Center and the Work Release Centers. The Commissioner shall approve the appointment of a Magistrate who shall perform all duties delegated to him/her under Section 4 and 5 hereunder. At the West Virginia Penitentiary and the Huttonsville Correctional Center the Magistrate shall have no duties except those assigned under these rules. In extraordinary circumstances, the Director of the Training Academy may designate a substitute Magistrate.

*v. Price*, 151 W.Va. 158, 150 S.E.2d 897 (1966); and *Brown v. Gobble*, 196 W.Va. 559, 474 S.E.2d 489 (1996).

After careful review of the arguments of the parties as well as the cases cited in support of these arguments, we agree with the appellants. As noted above, the starting point for our consideration of this issue is *Wolff v. McDonnell, supra.* In that case, the respondent, an inmate at the Nebraska Penal and Correctional Complex, alleged that the prison's disciplinary proceedings, which might result in the taking of good time, did not comply with the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. The following procedures governed when an inmate was written up or charged with a prison violation:

(a) The chief correction supervisor reviews the 'write-ups' on the inmates by the officers of the Complex daily;

(b) the convict is called to a conference with the chief correction supervisor and the charging party;

(c) following the conference, a conduct report is sent to the Adjustment Committee;

(d) there follows a hearing before the Adjustment Committee and the report is read to the inmate and discussed;

(e) if the inmate denies charge he may ask questions of the party writing him up;

(f) the Adjustment Committee can conduct additional investigations if it desires;

(g) punishment is imposed.

*Wolff*, 418 U.S. at 552–553, 94 S.Ct. at 2973, 41 L.Ed.2d at 949. One of the claims made by the respondent was that the Adjustment Committee which conducted hearings at the prison was not sufficiently impartial to satisfy the Due Process Clause. The Supreme Court disagreed, stating:

The Committee is made up of the Associate Warden Custody as chairman, the Correctional Industries Superintendent, and the Reception Center Director. The Chief Corrections Supervisor refers cases to the Committee after investigation and an initial interview with the inmate involved. The Committee is not left at large with unlimited discretion. It is directed to

meet daily and to operate within the principles stated in the controlling regulations, among which is the command that "[f]ull consideration must be given to the causes for the adverse behavior, the setting and circumstances in which it occurred, the man's accountability, and the correctional treatment goals," as well as the direction that "disciplinary measures will be taken only at such times and to such degrees as are necessary to regulate and control a man's behavior within acceptable limits and will never be rendered capriciously or in the nature of retaliation or revenge." We find no warrant in the record presented here for concluding that the Adjustment Committee presents such a hazard of arbitrary decisionmaking [sic] that it should be held violative of due process of law.

*Id.*, 418 U.S. at 571, 94 S.Ct. at 2982, 41 L.Ed.2d at 959–960. In a separate opinion concurring in part and dissenting in part, Justice Marshall opined:

[I]n my view there is no constitutional impediment to a disciplinary board composed of responsible prison officials like those on the Adjustment Committee here. While it might well be desirable to have persons from outside the prison system sitting on disciplinary panels, so as to eliminate any possibility that subtle institutional pressures may affect the outcome of disciplinary cases and to avoid any appearance of unfairness, in my view due process is satisfied as long as no member of the disciplinary board has been involved in the investigation or prosecution of the particular case, or has had any other form of personal involvement in the case.

*Id.*, 418 U.S. at 592, 94 S.Ct. at 2992, 41 L.Ed.2d at 972 (citations omitted).

In *Harrah, supra*, this Court was guided by the Supreme Court's holding in *Wolff* and stated in syllabus points 1 and 2:

1. Due process requirements for prison disciplinary hearings are:

(a) Written notice to the inmate of the claimed violation;

(b) Disclosure to him of the evidence against him;

(c) Opportunity to be heard and to present witnesses and documentary evidence;

(d) The right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation);

(e) A neutral and detached hearing body;

(f) A written statement by the fact-finders of the evidence relied on and reasons for discipline; and

(g) The right to counsel if the state is represented by a lawyer.

2. A disciplinary committee should be neutral and detached and should not have any member with personal knowledge of the incidents charged.

We find here that the provision in the circuit court's order requiring the appellants to contract with a person outside the Division of Corrections to conduct inmate disciplinary hearings and prohibiting that person from having an office in any correctional center exceeds the due process standards established by the United States Supreme Court and this Court.

■ Also, we agree with the appellants that the disciplinary process in place at the time of the final order meets constitutional due process standards and ensures the impartiality of magistrates in prison disciplinary proceedings. We find, therefore, that prison regulations requiring the removal of a magistrate in an inmate disciplinary hearing who witnessed the incident charged, participated in any way in the investigation, or has *any* personal interest in the outcome of the case, adequately provide for neutral and detached magistrates who have no personal knowledge of the incidents charged as required by the due process clauses of the Federal and State Constitutions.

As noted previously, the appellees contend that the circuit court's order on this issue is a necessary minimum reform in light of the "extensive" evidence presented to support the circuit court's finding of fairness and

independence problems in the magistrate system. Again, however, this Court has clearly stated the necessary minimum requirements to ensure a fair and independent magistrate system, and the policy adopted by the appellants conforms to these requirements. We are confident, therefore, that adherence to this policy will sufficiently remedy any fairness and independence issues that arise.

## C.

### *Issue No. 2: Medical Care*

■ Second, the appellants aver that the circuit court erred in ordering that future contracts for inmate medical services replace the five thousand dollar per incident threshold with a five hundred dollar threshold. According to the appellants, the circuit court's findings on this issue are wholly unsupported by facts and amount to nothing more than the beliefs of the circuit court. The appellants point to the adequacy of the medical care system in place at Huttonsville as of the date of the circuit court's final order. Under that system, the only prison medical program in the state which is fully accredited by the National Commission on Correctional Health Care, inmates have access to medical care twenty-four hours a day through the nursing staff and regularly scheduled appointments with doctors at the infirmary and off the prison site. Finally, the appellants assert that there is no evidence showing that they or the medical providers conducted themselves in an unconstitutional manner under the standards articulated in *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990).

The appellees reply that the denial of adequate medical care at Huttonsville was an ongoing problem that rose to the level of violating constitutional and statutory standards. In support, the appellees cite the applicable state regulations,[8] *Estelle v. Gam-*

---

8. The following sections of 95 C.S.R. 2 (1996) were quoted by the appellee:

14.1 Right to Medical Care. All inmates shall have prompt access to necessary medical, dental, and psychiatric care provided in a reason-

*ble, supra,* and *Dawson v. Kendrick,* 527 F.Supp. 1252, 1307 (S.D.W.Va.1981) which states that "systemic deficiencies manifested by insufficient or unqualified medical personnel, and inadequate medical facilities and procedures in a prison which make unnecessary suffering inevitable may constitute an unconstitutional deprivation." (Citations omitted). The appellees conclude that an inadequate medical system existed at Huttonsville because the five thousand dollar contractual threshold provided clear financial incentive to deny necessary follow-up care, lead to the refusal to use necessary specialists, and delayed needed rehabilitative care.

 There is no question that a governmental unit, such as the Huttonsville Correctional Center, has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. at 103, 97 S.Ct. at 290, 50 L.Ed.2d at 259 (1976). "Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Norris v. Detrick,* 918 F.Supp. 977, 984 (N.D.W.Va.1996), *aff'd,* 108 F.3d 1373 (4th Cir.1997) (citation omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, or lack thereof, must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id., citing Miltier v. Beorn,* 896 F.2d 848, 851

(4th Cir.1990). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." *Miltier,* 896 F.2d at 851 (citation omitted). As noted by the appellees, a prison's systemic deficiencies may rise to the level of a constitutional deprivation.[9]

The propriety of the circuit court's finding that the five thousand dollar per incident threshold built into the medical contract provides an incentive for the medical provider to deny medical services, therefore amounting to a constitutional deprivation, hinges on the evidence presented below. A finding of fact made by a trial court will be reversed if the finding is without evidence to support it. *See Boggs v. Settle,* 150 W.Va. 330, 145 S.E.2d 446 (1965). In their brief to this Court, the appellees allude to "years of considering testimony" in several different hearings but do not recite any specific evidence that was brought forth during this time period.[10] Likewise, in its final order, the circuit court fails to cite any specific evidence but states that the five thousand dollar threshold "might be a fiscal incentive" to discourage or delay needed medical care. This Court has searched the record of the proceedings below and has failed to uncover specific evidence to support the proposition that the threshold has caused the denial of medical care. In the transcript of the November 23, 1996 hearing, the circuit court frankly states that there is nothing to prove that inmates were denied medical care because of the medical provid-

able manner by licensed personnel. Correctional Facility policies and procedures shall provide for unimpeded access to health care and for a system for processing complaints regarding health care. These policies and procedures which assure access to health care shall be communicated orally and in writing to each inmate upon arrival in the facility.
14.2 Responsibility. Medical, dental, and mental health matters involving clinical judgments are the sole province of the responsible physician, dentist, and psychiatrist or qualified psychologist respectively; however, security regulations applicable to facility personnel also apply to health personnel. The Chief Executive Officer responsible for the facility shall provide the administrative support for the accessibility of health services to inmates.
14.28 Continuity of Care; Surgery. Inmates shall be provided all needed follow-up care,

laboratory services, physical therapy, physical aids and surgery, other than cosmetic surgery, as needed including referral to community care.

9. In addition, *see* footnote 8 which sets forth the relevant regulatory requirements for inmate medical care.

10. Unfortunately, several evidentiary hearings apparently held from 1985 to 1996 were not designated as part of the record by the appellants. This Court would have preferred access to these transcripts. However, as noted above, we have read the transcript of the final evidentiary hearing which includes a candid discussion of the evidence on this issue. In addition, we have the orders entered in this case and the briefs of the parties.

er's attempts to save money.[11] In light of the insufficiency of evidence to support the circuit court's finding on this issue, we conclude that the circuit court erred in ordering that contracts for inmate medical services replace the five thousand dollar per incident threshold with a five hundred dollar threshold.[12]

We emphasize that in reaching this conclusion, our only consideration is whether the evidence in the record supports the finding of the circuit court. We are not passing judgment on the logic or wisdom of the circuit court's reasoning or belief on this issue. However, it is not the task of this Court nor the circuit court to determine whether there is a better system of providing medical care or to formulate such a system. We must be careful not to substitute our judgment for that of prison administrators.

### D.

*Issue No. 3: The Circuit Court's Authority in a Mandamus Action*

■ Finally, the appellants assert that the circuit court exceeded its authority in a mandamus action by prescribing how prison officials are to carry out their discretionary duties. Essentially, the appellants contend the duties at issue here are discretionary. This is because prison officials must provide adequate medical care, but the nature and specific type of that care are within their discretion. Likewise, prison officials must provide neutral and detached decision makers, but no law sets forth the specifics of that requirement. According to the appellants, the rule is clear that where an official is to perform a discretionary duty, mandamus will lie only to compel the exercise of the duty and not to compel the specifics of the performance.

The appellees respond that the duties herein are non-discretionary duties. According to the appellees, courts have broad equitable powers to remedy violations of fundamental constitutional rights. *Citing Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) ("[O]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann*, 402 U.S. at 15, 91 S.Ct. at 1276, 28 L.Ed.2d at 566. "As with any equity case, the nature of the [constitutional] violation determines the scope of the remedy." *Id.*, 402 U.S. at 16, 91 S.Ct. at 1276, 28 L.Ed.2d at 567.); and *Crain v. Bordenkircher*, 176 W.Va. 338, 342 S.E.2d 422 (1986).

■ We agree with the appellants. It is well-settled that "[m]andamus lies to require the discharge by a public officer of a nondiscretionary [sic] duty." Syllabus Point 3, *State ex rel. Greenbrier County Airport Authority v. Hanna*, 151 W.Va. 479, 153 S.E.2d 284 (1967). A non-discretionary or ministerial duty in the context of a mandamus action is one that "is so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of its performance[.]" Syllabus Point 3, in part, *Walter v. Ritchie*, 156 W.Va. 98, 191 S.E.2d 275 (1972). Also, "[m]andamus is a proper remedy to compel tribunals and

---

11. An excerpt of this discussion between the circuit court and Mr. Hedges, counsel for the appellees is as follows:

> Mr. Hedges: We're complaining about this issue of, because it costs the contractor money, getting the outside care, in every context of need, it's getting—
>
> The Court: Well, academically, I understand your argument.
>
> Factually, we don't have anything to really prove that there's people that are not getting medical care because they're trying to save the $5,000.00, though.
>
> Mr. Hedges: We have—no.
>
> I mean, you can't say—pin it on one factor, and I wouldn't begin to say this is a hundred

percent of the problem; it's not, but there are other pressures on the system.

> We've had testimony—in every one of these twenty-some hearings that we've had, the majority of them have had some—have had elements of not being able to get that outside medical care, so the Court has before it all that evidence[.]

12. The appellants also argue in their brief that showing a deliberate denial of medical care by the private medical provider is not sufficient to implicate the appellant administrators. Because the appellants prevail on the issue of medical care, we do not find it necessary to discuss this issue.

officers exercising discretionary and judicial powers to act, when they refuse so to do, in violation of their duty, but it is never employed to prescribe in what manner they shall act, or to correct errors they have made." Syllabus Point 1, *State ex rel. Buxton v. O'Brien*, 97 W.Va. 343, 125 S.E. 154 (1924). Clearly, the duties here are discretionary. Under our constitution, the appellants must provide neutral and detached magistrates who have no personal knowledge of the facts of the case before them. However, the manner in which to bring this about is within their discretion. Such is also the case with providing a constitutionally acceptable level of medical care. We find, therefore, that the duties required of prison officials to provide a system of impartial magistrates in inmate disciplinary hearings and to provide a constitutionally acceptable level of medical care are discretionary in nature so that mandamus is a proper remedy to compel the performance of these duties, but not to prescribe the manner in which they must be carried out. Accordingly, we conclude that the circuit court exceeded it powers when it prescribed specific methods with which to guarantee an impartial magistrate system and an effective health care system.

## IV.

### CONCLUSION

For the reasons set forth above, we find that the circuit court erred in requiring the appellants to contract with a person outside the Division of Corrections to conduct inmate disciplinary hearings and prohibiting that person from having an office in any correctional center. We also find that the circuit court erred in ordering that future contracts for inmate medical services at the Huttonsville Correctional Center must provide for a per incident threshold not to exceed five hundred dollars. Finally, we find that the circuit court exceeded it powers in a mandamus action by prescribing how prison officials are to carry out their discretionary duties. Accordingly, the provision of the December 26, 1996 final order of the circuit court requiring the appellants to contract with a person outside the Division of Corrections to conduct inmate disciplinary hearings

and the provision ordering that future contracts for outside inmate medical services provide for a per incident threshold not to exceed five hundred dollars are reversed. The remaining provisions of the final order are affirmed.

Affirmed in part and reversed in part.

STARCHER, J., deeming himself disqualified, did not participate in the decision in this case.

PRATT, Judge, sitting by special assignment.