[No. E046800. Fourth Dist., Div. Two. Feb. 23, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
LOREN CHARLES GONZALES, Defendant and Appellant.

**COUNSEL**

Dennis L. Cava, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton, Janet Neeley and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GAUT, J.**—Following entry of this court's decision in this case, defendant filed a petition for rehearing of this appeal, arguing this court should

reconsider whether Penal Code section 290.011, subdivision (g) and jury instruction CALCRIM No. 1170 are unconstitutionally vague and ambiguous. This court granted the petition and reheard the matter on February 2, 2010. Upon considering defendant's petition for rehearing and the People's response, as well as additional oral and written argument, this court adheres to its original decision, which remains unchanged as follows.

Defendant Loren Charles Gonzales appeals from judgment entered following a jury conviction for failure to register as a sex offender during the period of March 29, 2006, through April 21, 2006 (Pen. Code, § 290, subd. (g)(2); count 1).[1] The trial court also found true allegations that defendant had a prior strike (§§ 1170.12, subds. (a)–(d), 667, subds. (b)–(i)) and prior prison term (§ 667.5, subd. (b)). The court sentenced defendant to five years in prison.

Defendant contends there was insufficient evidence supporting his conviction for failing to register as a sex offender. Alternatively, defendant argues jury instruction CALCRIM No. 1170 was vague and ambiguous and did not adequately define the term "residence," in violation of defendant's state and federal constitutional rights to due process. Defendant further alternatively asserts he was denied effective assistance of counsel. In defendant's supplemental brief, defendant argues the definition of "residence" in section 290.011, subdivision (g)[2] is unconstitutionally vague and ambiguous, in violation of his state and federal constitutional due process rights.

We reject defendant's contentions and affirm the judgment.

### 1. Facts

As a convicted sex offender, in February 2006, defendant registered 17264 Lurelane Street in Fontana as his sole residence. Defendant also registered one vehicle, a 1990 Geo Storm. Roxanne Wendt, a Fontana Police Department secretary, who was responsible for assisting registration of sex offenders, testified that, when defendant registered in February 2006, she asked defendant if he was employed. Defendant told her he was the owner of the Essex House, purportedly a sober living home located at 17264 Lurelane, the same address where he said he was residing.

When defendant met with his parole agent on March 29, 2006, he was told to reregister that same day. Defendant did so. He reregistered the Lurelane address. Defendant did not register any other residence. Defendant also registered a 1991 Toyota van, in addition to the Geo Storm.

---

[1] Unless otherwise noted, all statutory references are to the Penal Code.

[2] Section 290.011, subdivision (g) is referred to herein as section 290.011(g).

During the trial, several residents on Lurelane testified that during the period of February to April 2006, they believed defendant either was not living at the Lurelane home or was a part-time resident. Ruth Hagerwood, who lived at 17284 Lurelane Street, a couple of houses away from defendant, testified that, after she discovered defendant was a sex offender, she was more watchful of defendant because she had children. She and several neighbors met and discussed defendant and began watching him and his vehicle.

Hagerwood noticed defendant drove a small white car. She did not see it at defendant's Lurelane house every night. Sometimes it was there the entire night. Sometimes the car was not there when Hagerwood left for work around 5:00 a.m., and there were times when the car was not there at 11:00 p.m. Hagerwood believed that some nights defendant was not at the Lurelane residence, but she could not be certain of this.

Dimas Avila, who also lived on Lurelane, one house away from defendant, testified that around March or April 2006, he became aware from neighbors that defendant was a sex offender. A few times during March and April 2006, Avila saw defendant and an African-American woman at the Lurelane house. Avila also noticed their white van nearby.

Based on the number of times Avila saw defendant leaving the Lurelane home, he believed defendant was not staying at the home, but Avila did not know this for sure. At a city council meeting, Avila and five or six neighbors mentioned their concerns about a sex offender living nearby. Avila was also concerned about the number of people living in defendant's Lurelane home.

Several residents on Fairhaven Drive in Fontana testified that, during the period of March and April 2006, they believed defendant had been spending the night or residing at Jocelyn Essex's (Essex) home on 14986 Fairhaven Drive. Darla Payan (Payan) testified she lived across the street and one house over from Essex's home. Payan saw defendant at Essex's house daily, about 9:30 or 10:00 p.m. Payan noticed defendant drove to and from the Essex house in a small, white, new Nissan. She also saw defendant and Essex drive away from Essex's house in a maroon van.

Payan testified that she believed at the time that defendant was living at Essex's house on Fairhaven but Payan did not know for sure. Payan thought this because she saw his car arrive late at night and it was still there early in the morning. From her observations, Payan believed, at a minimum, defendant was spending the night there occasionally.

Payan's 23-year-old daughter, Kristin Payan, testified that during March and April 2006, she saw defendant at Essex's house about five times. Kristin

saw him when she came home late at night. She thought defendant might be living at Essex's house or spending the night because he was there late at night, but she did not know for sure.

Lewis Lim, who also lived on Fairhaven, lived next door to Payan. Lim testified he saw defendant at Essex's house "off and on" throughout the day and night. Lim stated that defendant drove a white Geo Storm. Lim believed defendant possibly was living at Essex's home and had stayed at her house overnight at least once.

Essex's brother, Larry Reed, testified his daughter, Tameka Reed, was living with Essex on Fairhaven. Reed knew defendant because defendant had lived with Reed in 2004 and 2005, while Reed was managing Essex's boarding house in Bloomington. Defendant was supposed to be residing there but was gone half the time.

Twice, Reed had called defendant's parole agent, Cristina Estrada, because defendant had lied to Reed about who he was and had not told Reed he was a registered sex offender. Reed checked the Megan's Law Web site and discovered defendant was a sex offender. Reed then called defendant's parole officer. Reed was concerned because his daughter was living in the same house as defendant.

Reed testified that he frequently went to visit his daughter and sister, Essex. During one visit in the morning, Reed saw defendant at Essex's Fairhaven home in pajamas and house shoes. He was dressed as if he had just gotten out of bed. Reed believed defendant had a bedroom there because he saw defendant leave the room and that was where he normally was.

Reed had seen defendant at Essex's house at least 10 or 15 times, usually early in the morning or in the evening. Whenever Reed went to Essex's house, defendant was there. The last time Reed saw defendant at the Fairhaven house was in 2005. Reed also testified he saw defendant at Essex's house the week before he called defendant's parole agent.

Due to neighbors expressing concerns about the people living at 17264 Lurelane, on March 7, 2006, Police Officer Yarrington went to the house, known as the "Sober Living Home," to speak with Essex and defendant for the purpose of ensuring the facility had proper licenses and permits, and to determine whether it was a boarding house or a sober living home. Yarrington also went to the home to determine whether there were any sex offenders or parolees there. Defendant was not there. Essex told Yarrington she would provide information as to who lived there. Essex also told Yarrington she was buying the Lurelane property as a partner with defendant, who owned the property, and they were going to use the property as a sober living home.

Because the police never received any information from Essex, officers went back to the Lurelane house a few days later. The officers were told defendant and Essex had gone to Essex's home on Fairhaven. The officers went to the Fairhaven home. Essex answered the door and claimed defendant was not there. A few minutes later, defendant came to the door wearing slippers. He said he had been sleeping in the back room. The police reminded defendant he needed to reregister with the Fontana Police Department because he had a drastic change in appearance since his last parole photograph and because he had been released from custody on March 8. Defendant was told he had until March 14 to register.

Estrada, defendant's parole agent in March and April 2006, testified she explained to defendant his obligations under section 290 to register as a sex offender throughout his lifetime.

On March 29, 2006, defendant attended a meeting at the Ontario Parole Office to discuss his status and update his registration. Registration requirements were again explained to defendant and he asked questions about the requirements. He appeared to understand them. It was determined at the meeting on March 29, that defendant was driving Essex's van, which defendant had not registered, and registration was required under section 290. Yarrington told defendant he needed to update his registration.

The police also told defendant they were concerned that he was not living at the Lurelane home and might be staying at more than one residence. Defendant was told he was required to register for each one and that, under section 290, he was required to register a residence even if he stayed there only one night. Defendant denied he had spent the night or was living at Essex's Fairhaven home and claimed he had not stayed there past his 10:00 p.m. curfew. Defendant admitted he was dating Essex's daughter, who lived at the Fairhaven home.

On April 20, 2006, defendant's parole agent, Estrada, told the Fontana Police Department that Essex's brother, Larry Reed, had told her he was concerned that defendant was living at Essex's Fairhaven home along with Reed's 15-year-old daughter, Tameka. When Officer Yarrington initially interviewed Tameka, she told him she did not know defendant and that he had never been at the Fairhaven home. Later during the interview, Tameka said that defendant was at Essex's home at least three times a week but said she did not initially tell Yarrington this because she did not want her aunt, Essex, to get in trouble. Yarrington also learned that defendant had not registered a 2006 Nissan vehicle he had purchased on April 3d.

On April 21, 2006, Officer Yarrington arrested defendant for violating section 290.

At trial, Tameka initially testified she never saw defendant at her home on Fairhaven and denied telling Officer Yarrington defendant was at Fairhaven three times a week. But then Tameka testified that sometimes defendant was at her home on Fairhaven when she got home from school. Tameka admitted she had initially lied that defendant never came over to her home because she did not want anyone to get in trouble. Tameka then admitted that defendant had been at Fairhaven at least three times a week when she was there but she did not believe he had ever spent the night.

Essex's husband, Charles Essex, testified he lived at the Fairhaven home with his wife, Essex, and with his niece, Tameka, and stepchildren, Miesha and Dmitri. Defendant did not live with them but was at their home on a daily basis because he was helping Essex with her sober living home business. Charles was confined upstairs because of his poor health. Charles stated that defendant had a white Geo that broke down and a white Sentra (Nissan).

Essex testified defendant began working for her while living at one of her sober living homes. After defendant purchased the Lurelane home, defendant became business partners with Essex and Essex moved some of her clients to defendant's Lurelane home. Essex never purchased an interest in the Lurelane home and, at the time of trial, no longer had a business relationship with defendant.

According to Essex, defendant lived at his Lurelane home and never spent the night at the Fairhaven home. He had no personal items there. Sometimes defendant would drive Essex places because she had a vision problem. They were not romantically involved. He was her assistant. Defendant normally arrived at the Fairhaven home at 10:00 a.m. and left by about 8:00 p.m. Essex claimed her brother, Reed, was a liar.

## 2. Sufficiency of Evidence

Defendant contends there was insufficient evidence to support his conviction for failing to register as a sex offender during the period of March 29, 2006, through April 21, 2006 (§ 290, subd. (g)(2)).

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to

support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

The version of section 290 applicable at the time of the charged offense in this case stated in relevant part as follows: "(a)(1)(A) Every person described in paragraph (2), for the rest of his or her life . . . shall be required to register with the chief of police of the city in which he or she is residing, or the sheriff of the county . . . within five working days of coming into, or changing his or her residence . . . . [¶] (B) If the person who is registering has more than one residence address at which he or she regularly resides, he or she shall register in accordance with subparagraph (A) in each of the jurisdictions in which he or she regularly resides, regardless of the number of days or nights spent there. If all of the addresses are within the same jurisdiction, the person shall provide the registering authority with all of the addresses where he or she regularly resides." (§ 290, subd. (a).)[3] The purpose of this statute is to enable local law enforcement agencies to keep known sex offenders under surveillance. (*People v. Poslof* (2005) 126 Cal.App.4th 92, 97 [24 Cal.Rptr.3d 262] (*Poslof*); *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1218 [64 Cal.Rptr.2d 545] (*McCleod*).)

The trial court instructed the jury under jury instruction CALCRIM No. 1170 on the charged crime of failing to register as a sexual offender as follows: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant was previously convicted of a felony sex offense requiring registration; [¶] 2. The defendant actually knew he had a duty to register as a sex offender under Penal Code Section 290 *every residence at which he regularly resides, regardless of the number of days or nights spent there*, providing the registering authority with *all of the addresses where he regularly resides*; and [¶] 3. The defendant willfully failed to register as a sex offender with the police chief of that city every residence at which he regularly resides, *regardless of the number of days or nights spent there, providing the registering authority with all of the addresses where he regularly resides.* [¶] Someone commits an act willfully when he does it willingly or on purpose." (Italics added.)

Defendant argues there was insufficient evidence that he violated section 290 during the period of March 29, 2006, through April 21, 2006, by willfully failing to register the Fairhaven home as a residence. He claims there was no substantial evidence that defendant resided at the Fairhaven house for even one night. Defendant urges this court to consider the defense

[3] Unless stated otherwise, citation in this opinion to section 290 is to the former version of the statute in effect at the time of the charged offense in March and April 2006. (See Stats. 2005, ch. 722, § 3.5, eff. Oct. 7, 2005, operative Jan. 1, 2006.)

evidence, particularly evidence that defendant was over at the Fairhaven house solely for the purpose of assisting Essex with her business and was not spending the night there.

We may not reverse defendant's conviction simply because differing inferences and findings could have been made by the trier of fact. This court may not reweigh the evidence and "substitute its judgment for that of the jury. If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139 [17 Cal.Rptr.2d 375, 847 P.2d 55].) " ' "Issues of fact and credibility are questions [of fact] for the trial court, not this court. [Citation.] 'The rule is clear that the power of the appellate courts begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the trier of fact.' [Citation.]" [Citation.]' [Citation.]" (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733–734 [7 Cal.Rptr.2d 60].)

Here, there was sufficient evidence to support the jury's finding that defendant violated section 290 by failing to register Fairhaven as a residence. Such evidence included statements by defendant's Lurelane neighbors that it appeared to them that defendant either was not living at the Lurelane home or was there only part time. His neighbors, Ruth Hagerwood and Dimas Avila, began watching defendant more closely during March and April 2006, upon discovering he was a sex offender. Hagerwood noticed defendant's car was not at the Lurelane home every night. Sometimes it was not there at 11:00 p.m. or when she left for work at 5:00 a.m. Avila stated that, based on the number of times he had seen defendant leaving the residence, he believed defendant was not staying or residing at the Lurelane home.

In addition, Fairhaven neighbors, including Darla Payan, Kristin Payan, and Lewis Lim, testified they believed defendant had been spending nights or living at Essex's home on Fairhaven. Payan testified she believed defendant was living at Essex's house. She saw defendant arrive daily in his car late at night at Essex's house and leave early in the morning. She believed, at a minimum, defendant had on occasion stayed overnight at the Fairhaven home. Kristin also thought defendant might be living at Essex's house or spending the night because he was there late at night. Lewis Lim testified he saw defendant at Essex's house "off and on" throughout the days and nights. Lim believed defendant was possibly living at Essex's home and had stayed at her house overnight at least once.

Essex's brother, Larry Reed, whose daughter was living with Essex at the Fairhaven home, testified he also believed defendant was living at the

Fairhaven home. Aware that defendant was a sex offender, Reed informed defendant's parole office of his concerns about this, including in April 2006. Reed had seen defendant at the Fairhaven home numerous times, including early in the morning and late at night. Reed had seen defendant dressed in pajamas and slippers, and it appeared that defendant had his own bedroom at the Fairhaven house.

Tameka initially testified she did not know defendant and had never seen him at the Fairhaven house. She then admitted she had lied and the truth was that defendant was at the Fairhaven house at least three times a week.

Essex's husband, Charles, acknowledged defendant was frequently at the Fairhaven home because defendant assisted Essex with her business but claimed he never spent the night there. However Charles stated that due to his poor health, he was confined to the upstairs. Essex acknowledged that, because defendant helped her with her business, he was often at the Fairhaven home between 10:00 a.m. and 8:00 p.m.

There is ample evidence that defendant spent the night at the Fairhaven house, and even if he did not, the evidence was more than sufficient to support the jury's finding that defendant regularly resided at the Fairhaven home in violation of section 290, since he spent a great deal of time there and was at the home on a regular basis.

### 3. Jury Instruction Challenge

Defendant contends his federal and state constitutional rights to due process were violated by the trial court failing to instruct the jury adequately on the requirement to register as a sex offender under section 290. Specifically, defendant argues the phrase in CALCRIM No. 1170, "every residence at which he regularly resides, regardless of the number of days or nights spent there," ambiguous and does not adequately define the "residence" element of the section 290 offense.

As stated previously, the trial court read to the jury CALCRIM No. 1170, stating the elements of a section 290 offense, which included proof that "The defendant actually knew he had a duty to register . . . **every residence at which he regularly resides, regardless of the number of days or nights spent there**, providing the registering authority with **all of the addresses where he regularly resides**" (boldface added), and willfully failed to do so.

Defendant notes that the jury instruction given to the jury alludes to the same definition of "residence" provided in section 290.011(g), which states: " 'Residence' means one or more addresses *at which a person regularly*

*resides, regardless of the number of days or nights spent there,* such as a shelter or structure that can be located by a street address, including, but not limited to, houses, apartment buildings, motels, hotels, homeless shelters, and recreational and other vehicles." (Italics added.) This statute was enacted in 2007, after commission of the charged offense in 2006, but before defendant's trial.

Defendant argues this language used in CALCRIM No. 1170 does not adequately define the residence element of a section 290 offense. It alludes to the section 290.011(g) definition of residence, which is not the meaning commonly understood by the average person. Citing *People v. Williams* (2009) 171 Cal.App.4th 1667 [90 Cal.Rptr.3d 665] (*Williams*), defendant argues the common meaning of "reside," as stated in the 1973 version of the Random House Dictionary of the English Language, is " 'to dwell permanently or for a considerable time.' " (*Id.* at p. 1673, fn. 2.) This commonly understood definition differs from the definition provided in CALCRIM No. 1170 and section 290.011(g).

During trial deliberations, the jury sent the court the following question: "What is the court['s] definition of 'reside,' particularly withe [*sic*] the qualifier 'day or night.' " The trial court provided the jury with the following response: " 'Reside' or 'residence' is not specifically defined in the instructions because its legal meaning is no different than the meaning in everyday use. In determining the definition of 'reside' or 'residence' use your common sense and logic and use the ordinary, everyday meaning of the word. Refer back to the actual instruction, Number 1170 for additional clarification."

The trial court noted on the record, before giving this supplemental instruction, that the supplemental instruction was agreed upon by both parties. The court added that, if the jury requested additional clarification, the court would give the following instruction: " 'Reside' or 'residence' connotes more than passing through or presence for a limited visit. As used in the instruction, the term 'reside' or 'residence' means a temporary or permanent place, which one keeps and to which one intends to return, as opposed to a place where one rests or shelters during a trip or a transient visit. Depending upon the circumstances, one may have a single place of residence or more than one place of residence."

The prosecutor objected to the court giving this additional instruction on the ground it was not consistent with statutory and case law at the time of the commission of the offense in 2006. Defense counsel stated that, although he did not object to the court giving the more general supplemental instruction, he wanted the court also to give the jury the second supplemental instruction

which provided a more detailed definition of "residence." The second supplemental instruction was not given since the jury did not request further clarification.

■ A trial court has a sua sponte duty to instruct on all general principles of law that are closely and openly connected with the facts of the case. (*People v. Ervin* (2000) 22 Cal.4th 48, 90 [91 Cal.Rptr.2d 623, 990 P.2d 506].) In a criminal case, the general principles of the law include all the elements of the charged offense. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1].) Also, if the elements of the offense include a term that has a technical legal meaning that is different from its common meaning, the court has a sua sponte duty to define that term. (*People v. Elam* (2001) 91 Cal.App.4th 298, 307 [110 Cal.Rptr.2d 185].) Defendant argues the term residence had a technical meaning under section 290 and therefore the court erred in not providing the second more detailed definition of residence.

We reject this contention. In *McCleod, supra*, 55 Cal.App.4th 1205, the court stated that the term "residence," as used in section 290, was a commonly understood term, without technical meaning, that did not have to be defined by the court. The *McCleod* court concluded the term was easily understood by persons of common intelligence as connoting " 'more than a passing through or presence for a limited visit.' " (55 Cal.App.4th at p. 1218.) The court in *McCleod* therefore concluded: "Neither the courts nor the Legislature has seen the need to further define the common term of residence for section 290. Nor do we." (*Id.* at p. 1219.)

In the instant case, the initial and supplemental instructions alluding to the term "residence" were far more detailed than the instruction in *McCleod*, in which there was no elaboration on the term at all. (*McCleod, supra*, 55 Cal.App.4th at p. 1213.) In *McCleod*, the jury requested a definition of the term but before the trial court responded, the jury had reached a verdict. The *McCleod* court rejected the defendant's jury instruction challenge, concluding the trial court had properly instructed the jury on the crime. (*Id.* at p. 1216.)

After *McCleod* was decided, the Legislature added, in 2007, section 290.011, which clarified registration requirements for those convicted sex offenders who are transients and provided a definition of "residence." Although this provision was enacted after defendant committed the section 290 offense, the trial took place in 2008, after enactment of section 290.011. The trial court thus included in the jury instructions the definition of "residence" stated in section 290.011(g). This statutory definition of residence is consistent with the jury instruction definition provided to the jury in the instant case.

Defendant argues that, because the Legislature defined "residence" in section 290.011(g) and the definition is not the common meaning of "residence," the term has a technical meaning and therefore must be adequately defined for the jury, as was done in the second proposed supplemental instruction, which was not given to the jury.

We disagree that any additional instruction was required. The instructions sufficiently explained that registration was required for each location in which defendant was regularly spending time. The definition provided in section 290.011(g) makes it clear the Legislature did not intend to limit registration to a narrower definition than that provided in section 290.011, which was included in the jury instructions provided to the jury in the instant case. Such definition is broad, with no limitations as to a set amount of time or time of day for a finding of residence. This is consistent with the objective of section 290, which, as stated in *McCleod, supra*, 55 Cal.App.4th 1205, is to enable local law enforcement agencies to keep known sex offenders under surveillance at all times " ' "because the Legislature deemed them likely to commit similar offenses in the future. . . ." Plainly, the Legislature perceives that sex offenders pose a "continuing threat to society" [citation] and require constant vigilance. [Citation.]' " (*Id.* at p. 1218, citation omitted, quoting *Wright v. Superior Court* (1997) 15 Cal.4th 521, 527–528 [63 Cal.Rptr.2d 322, 936 P.2d 101]; see also *Poslof, supra*, 126 Cal.App.4th at p. 97.)

The trial court thus did not commit instructional error or violate defendant's due process rights by not defining residence in greater detail. The trial court adequately instructed the jury on the elements of the section 290 offense.

Since we reject defendant's instructional error challenge on the merits, we also reject defendant's ineffective assistance of counsel challenge.

### 4.   Constitutionality of Definition of Residence in Section 290.011(g)

Defendant contends the definition of "residence" in section 290.011(g) is unconstitutionally vague and ambiguous because the definition does not give a convicted sex offender a reasonable opportunity to know when he must register a dwelling as a residence.

Section 290.011(g), defines "residence" as *"one or more addresses at which a person regularly resides, regardless of the number of days or nights spent there,* such as a shelter or structure that can be located by a street address, including, but not limited to, houses, apartment buildings, motels, hotels, homeless shelters, and recreational and other vehicles." (Italics added.)

The italicized portion of this definition is similar to that which was included in the jury instructions given to the jury on the elements of a section 290 offense.

Citing *People v. North* (2003) 112 Cal.App.4th 621 [5 Cal.Rptr.3d 337] (*North*), defendant argues that the term residence, defined in section 290.011(g), is unconstitutionally vague for the same reasons the court in *North* held that the term "location" in section 290 was unconstitutionally vague. In *North*, the court concluded section 290 failed to provide enough specificity for either the offender or the authorities to understand what registration requirements the statute demanded of transient offenders who were required to specify all the places where they were regularly located.

Not only are the facts of *North, supra*, 112 Cal.App.4th 621 distinguishable but, also, the court in *North* did not address the issue raised in the instant case of whether the language in section 290.011(g), pertaining to the definition of "residence," is unconstitutionally vague. Furthermore, the version of section 290 at issue in *North* was amended and is not applicable in the instant case. Nevertheless, the general discussion of the vagueness doctrine in *North* is relevant.

■ In discussing the vagueness doctrine, the *North* court explained that " 'The due process concept of fair warning is the underpinning of the vagueness doctrine, which "bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' " [Citations.] Recently, the United States Supreme Court had this to say on the topic: "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." [Citation.]' [Citation.]" (*North, supra*, 112 Cal.App.4th at p. 628.)

■ In determining whether a statute is unconstitutionally vague, we are guided by the following two principles stated in *North*: " 'First, "abstract legal commands must be applied in a specific context. A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness." [Citation.] Second, only reasonable specificity is required. [Citation.] Thus, a statute "will not be held void for vagueness 'if any reasonable and practical construction can be given its language or if its terms may be made reasonably certain by reference to other definable sources.' " [Citation.]' [Citation.] [¶] Terms that might otherwise be considered vague

may meet the standard of reasonable certainty when considered in context with other terms, and in view of the legislative purpose." (*North, supra,* 112 Cal.App.4th at p. 628.)

Defendant argues the definition of residence in section 290.011(g) is vague and ambiguous because it is not the meaning of "residence" commonly understood by the average person and it is not sufficiently detailed to provide adequate notice of when registration is required. Relying on a dictionary definition of residence stated in *Williams, supra,* 171 Cal.App.4th 1667, defendant argues the commonly understood meaning of "reside" is " 'to dwell permanently or for a considerable time.' " (*Id.* at p. 1673, fn. 2, citing the 1973 Random House Dict. of the English Language.)

■ But Black's Law Dictionary explains that *"Residence* usu. just means bodily presence as an inhabitant in a given place." (See Black's Law Dict. (8th ed. 2004) p. 1335, col. 1.) Black's Law Dictionary notes there is a distinction between the terms "residence" and "domicile," explaining that *"domicile* usu. requires bodily presence plus an intention to make the place one's home. A person thus may have more than one residence at a time but only one domicile." (Black's Law Dict. (8th ed. 2004) p. 1335, col. 1.) The definition of "residence" adopted in section 290.011(g) is consistent with this definition of the common meaning of residence. Thus it is reasonably certain to provide offenders and law enforcement with notice of the statutory registration requirements, when considered in context with other terms, and is adequate in view of the legislative purpose of allowing " 'local law enforcement agencies to keep known sex offenders under surveillance.' " (*Poslof, supra,* 126 Cal.App.4th at p. 97; see *North, supra,* 112 Cal.App.4th at p. 628.)

Furthermore, there was substantial evidence defendant was aware of the need to register the Fairhaven residence. There was evidence he was spending a considerable amount of time at the Fairhaven home. He was there daily or at least three days a week. He was living there or had spent the night there more than once. In addition, there was evidence defendant was told by law enforcement officers and his parole officer that he was required to register any place where he regularly resided, regardless of the number of days or nights spent there. Under any plausible reading of section 290.011(g), defendant was required to register the Fairhaven residence because he was regularly spending a significant amount of time there.

■ We conclude the language in section 290.011(g) defining "residence" is not unconstitutionally vague, particularly as applied to defendant.

### 5.   Disposition

The judgment is affirmed.

Ramirez, P. J., and King, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 14, 2010, S181642.