Filed 9/29/14  P. v. Horton CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B246874 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA125961) |
| v. | |
| EDMUND HORTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed.

Julie Schumer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Edmund Horton, appeals his conviction for violating the California Sex Offender Registration Act (Pen. Code, § 290.011, subd. (b)).[1] He was sentenced to state prison for a term of four years.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

Defendant Horton was a registered sex offender. State of California Parole Agent Corin Perez began supervising him in November 2011. As part of the parole process, Perez interviewed Horton and fitted his ankle with a global positioning system (GPS) tracking device. Horton registered under the Sex Offender Registration Act as a transient in January 2012.

Perez testified the registration policy defined a "transient" as a person who had no residence, and that transients were required to register every 30 days and visit a parole officer on a weekly basis. Regularly spending two or three nights a week at the same place disqualified a registrant from being a transient; a determination as to whether a particular location had become a residence was based on a totality of the circumstances. By monitoring Horton's movements with the GPS tracking system, Perez discovered he had often been spending the night in Downey at the residence of his girlfriend, Antoinette Easley. In February 2012, Perez advised Horton he had to register Easley's residence because he was spending so much time there. Horton responded by saying he was "not doing anything wrong, I'm not hurting anybody." He did not want to register Easley's residence because it would endanger her Section 8 housing benefits.

In March and April of 2012, Horton was still registering as a transient although he continued to regularly stay with Easley. Perez had told Horton at the end of March she "wasn't happy about the fact that he was still registering as transient." When Horton again registered as a transient in April, Perez spoke to her supervisor. At a conference

---

[1] All further references are to the Penal Code unless otherwise specified.

with Horton that month, his movements between November 2011 through April 2012 were reviewed. Perez expressed her concern about the amount of time Horton was spending at Easley's residence. She and her supervisor explained the registration policy to Horton, who never indicated he did not understand the rules.

Nevertheless, Horton did not change his registration to a non-transient status although he continued to stay at Easley's residence, so Perez's supervisor authorized a parole violation arrest. While escorting Horton to jail, Perez indicated she was frustrated with his continued failure to follow the rules. Horton got very upset: "[He] wasn't arguing the fact that I was taking him into custody. He was more arguing the fact that he felt why did you not take me into custody a long time ago? It's been happening. What, you're scared? Kind of saying that I was scared to take him into custody. [¶] And I expressed to him that was not the case, I was hoping for a change in behavior, and I was hoping that my efforts to redirect him would be successful, and unfortunately they were not."

However, Perez then decided to give Horton another chance to comply with his parole conditions because she believed he was at least trying to make an effort. She spoke to Horton and Easley about properly following the rules, and expressly warned Easley she was jeopardizing her Section 8 housing. Easley promised "it won't happen anymore, I get it." According to Perez, "[Horton] understood it, [Easley] understood it, and we went forward."

Thereafter, Horton tried to register as a transient in Compton. The attempt failed because the GPS tracking information showed he had been spending so much time in Downey. Horton then tried to register as a transient at the Downey Police Department, but Perez had already informed officials there that he was not a transient. Perez alerted Section 8 housing authorities to the situation because she wanted Easley to recognize there was a problem; Perez was hoping Easley would refuse to let Horton stay with her. But then on May 23, 2012, Perez told Horton to register at Easley's residence so he would be in compliance with the Act.

On June 20, 2012, Perez ran a GPS tracking software program for the past 30 days. The report showed Horton spending two or three nights every week with Easley. The rest of the time Horton was staying at a number of other regular places, most often a residence in Compton where his child's mother lived. Horton had not, however, registered any of these other addresses either.

Police Officer Jaime Pelayo was in charge of sex-offender registrants in Compton. On May 30, 2012, Horton called Pelayo to set up an appointment so he could register as a transient. He told Pelayo he was staying with his girlfriend in Downey "two or three nights a week, but he was primarily transient." When Pelayo told Horton he had to register Easley's address, Horton got belligerent, so Pelayo told him to call back after he cooled down. Horton called back three weeks later and again asked to register as a transient. Pelayo refused because he knew Horton was residing with Easley.

On July 25, 2012, Horton went to the Compton Police Department and again tried to register as a transient. This time he was detained on an unrelated arrest warrant and interviewed by Pelayo and Detective Price. Horton acknowledged he was not homeless; among other places, he stayed with the mother of his child in Compton and with Easley in Downey. He confirmed he was aware that "transient" meant having no place to stay. Pelayo concluded Horton was basically being honest, so his goal was to get Horton registered at Easley's address. Pelayo told Horton he understood the Section 8 problem, but "that in order to be in compliance with [the Act], he had to register [Easley's] address if he was going to continue to live there." Horton still refused to register Easley's address.

Easley testified Horton had spent the night at her house once or twice a week throughout the four years she had known him.

**CONTENTIONS**

1. The trial court erred by admitting GPS tracking evidence.

2. The trial court erred by excluding evidence that parole violations and criminal convictions have different standards of proof.

4

3.  Horton's attorney rendered ineffective assistance by not objecting to certain testimony.

4.  The trial court erred by excluding evidence of Detective Price's opinion that Horton was a transient.

5.  The trial court erred by refusing to vacate a Three Strikes prior.

## DISCUSSION

1. *Any error in admitting GPS tracking evidence was harmless.*

Horton contends the trial court erred by admitting evidence of GPS tracking information that lacked an adequate foundation. We conclude any error was harmless.

   a. *Background.*

Parole agent Perez testified at a pretrial hearing that she "handle[s] . . . a G.P.S. sex-offender caseload." She oversees 36 sex-offender parolees, all of whom she monitors with a GPS computer program called Veritracks: "Basically it's a monitor that's attached to their ankles, and it sends out signals to cell sites [and satellites], and it basically tells us every minute where they're at." The monitoring system tracks a person's location down to a city block. Perez testified she could log onto an internet website and see where her parolees were at any time, and that she spent four to six hours a day doing this.

Perez identified an eight-page report purporting to show Horton's whereabouts during specific periods of time. She had generated this report by means of the Veritracks system. Perez did not know anything about how the Veritracks software or hardware operated. Asked how accurate the system was, she said: "When we go out to look for something, it's pretty on task." Perez did not know what the system's margin of error was.

Defense counsel objected to the lack of an evidentiary foundation explaining how the system worked, and argued the evidence should not be admitted under the business records exception to the hearsay rule. The trial court disagreed, ruling it would admit the evidence assuming the prosecution could lay a proper foundation under the business records exception. Defense counsel later renewed the objection on the ground Perez's

inability to explain the GPS system's reliability or the science on which it was based amounted to a confrontation clause violation. The trial court admitted the GPS evidence.

b. *Discussion*.

Horton contends "that absent a proper foundation to establish the functioning, accuracy and reliability of the GPS tracking system, as well as Perez's qualifications to interpret the data, the trial court abused its discretion in admitting the GPS records." However, because it is clear that, even absent the GPS evidence, Horton would still have been convicted, we conclude any error in admitting the evidence was harmless. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 671 [harmless error test for wrongful admission of evidence is *Watson*[2] standard: it is reasonably probable a more favorable result would have been reached without the error]; *People v. Geier* (2007) 41 Cal.4th 555, 608, disapproved on other grounds in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 ["confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24, 87"].)

Section 290.011 provides, in pertinent part: "Every person who is required to register pursuant to the [Sex Offender Registration Act] who is living as a transient shall be required to register for the rest of his or her life as follows: [¶] . . . [¶] (b) A transient who moves to a residence shall have five working days within which to register at that address, in accordance with subdivision (b) of Section 290." Subdivision (g) of section 290.011 provides: "For purposes of the act, 'transient' means a person who has no residence. *'Residence' means one or more addresses at which a person regularly resides, regardless of the number of days or nights spent there*, such as a shelter or structure that can be located by a street address, including, but not limited to, houses, apartment buildings, motels, hotels, homeless shelters, and recreational and other vehicles." (Italics added.) (See *People v. Gonzales* (2010) 183 Cal.App.4th 24, 37 ["registration was required for each location in which defendant was regularly spending time"].)

---

**2**      *People v. Watson* (1956) 46 Cal.2d 818.

The trial record is replete with evidence Horton regularly resided with Easley. Horton argues: "Although Appellant and Easley both admitted he spent time at her house, the GPS documentation established just how much time that was." But section 290.011 merely requires that a person "regularly resides" at a particular address "regardless of the number of days or nights spent there." Horton has not cited any authority demonstrating that a precise number of hours or days must be proved in order to establish a violation of the statute. Horton argues, "While it is true that there was testimony from Easley and statements by Appellant that he spent several nights a week at Easley's apartment, the GPS records provided a misleading aura of scientific certainty of his guilt." But "scientific certainty" is not required by the statute and, in this case, it was mere icing on the cake given the undisputed non-GPS evidence showing Horton had been regularly residing with Easley.

The GPS evidence had no important effect on the outcome of Horton's trial and, therefore, its erroneous admission would have been mere harmless error under any standard.

2. *Trial court did not err by admitting testimony about Horton's arrest for violating parole.*

Horton contends the trial court erred by letting Perez testify she violated his parole for failing to register, while not allowing Horton to explain to the jury that parole violations and criminal convictions have different standards of proof. This claim is meritless.

a. *Background*.

Prior to Perez's testimony, defense counsel asked the trial court to preclude her from testifying she had once violated Horton's parole for failing to register: "I think that can be confusing to the jury given there's a different standard for parole violation versus a criminal offense, and so I would ask that the People be precluded from inquiring into" the parole violation. The trial court refused to exclude the testimony, but said defense counsel could cross-examine Perez about the difference in standards.

7

Perez testified it was a violation of parole for Horton to spend the night at Easley's residence without Perez's permission, and that she had once violated his parole for failing to register Easley's address. Defense counsel did not, however, ask Perez about the standard-of-proof difference between establishing a parole violation ("preponderance of the evidence" test) and a conviction for failing to register ("beyond a reasonable doubt" test).

Later, while cross-examining Pelayo, defense counsel asked what standard "a Board of Prison Terms commissioner" would apply in order to find a parole violation. The trial court sustained a prosecution objection based on the speculative nature of the question, and added the testimony was also inadmissible on relevance grounds.

b. *Discussion*.

Horton argues: " . . . Perez violated Appellant's parole for the very conduct for which he was on trial in a criminal proceeding, which was a form of failure to register. In the absence of an explanation that these different proceedings were subject to different standards of proof the jury was apt to conclude that because Appellant's parole had been violated, he was therefore guilty of the instant offense as the two were based on the same acts. The trial court therefore should have permitted the questioning of Detective Pelayo on cross-examination relative to this issue, questioning that the court had earlier promised would be allowed on cross-examination albeit with a different witness."

The Attorney General initially points out the trial court gave defense counsel permission to cross-examination Perez about the difference between the two standards of proof, but that defense counsel failed to pursue this line of questioning. The Attorney General argues Horton "cites no law supporting the proposition defense counsel's choice to forego this line of questioning somehow suggests the trial court erred by sustaining an objection raised later in the trial in response to a different question asked during defense counsel's cross-examination of a different witness." The Attorney General also argues there is nothing in the record to suggest the jury believed it could convict Horton under anything but the proper "beyond a reasonable doubt" standard.

8

Horton does not dispute the validity of either argument. We would add a further point. It is not clear Perez violated Horton's parole for the same conduct at issue in the instant criminal prosecution. Perez explained Horton had been registered in Torrance, but was spending a couple of nights a week with Easley in Downey. Perez testified: "Well, if he's going to be frequenting that address more than he's in Torrance, yes, he would have to register at that location, *but outside of that he also had special conditions of parole* where he was supposed to be given permission to stay anywhere other than the address or the residence of record where he actually registered at." (Italics added.)

We agree with the trial court that defense counsel's question to Pelayo was both speculative and irrelevant.

3. *No ineffective assistance of counsel regarding Pelayo's testimony.*

Horton contends he was denied the effective assistance of counsel because his trial attorney failed to object to certain testimony from Pelayo regarding Horton's past experience with the criminal justice system. This claim is meritless.

a. *Legal principles.*

A claim of ineffective assistance of counsel based on *Strickland v. Washington* (1984) 466 U.S. 668 [104 S.Ct. 2052], has two components: " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.' [Citation.] To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391.) "[T]he burden of proof that the defendant must meet in order to establish his entitlement to relief

9

on an ineffective-assistance claim is preponderance of the evidence." (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)  An appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Strickland v. Washington, supra,* 466 U.S. at p. 697.)

b. *Background.*

The following colloquy occurred during the course of Pelayo's cross-examination:

"Q.  You indicated multiple times you believed Mr. Horton was being honest with you during the course of this interrogation; correct?

"A.  Yes.

"Q.  And during the course of this interrogation, he indicated to you he did not live with Ms. Easley, did he not?

"A.  He indicated a lot of things.  I don't know what part in the interview he indicated he didn't live there, but he would make a statement like that and then explain himself that he would sleep there.

"Q.  In other words, he had a differing opinion of what 'lived there' meant than what you understood it to be.  Would that be fair?

"A.  If you're asking my opinion in interpreting how he would answer, he was trying to avoid giving a definitive answer because he knew, in my opinion, it could be used against him.

"Q.  It didn't occur to you that maybe he just differed in his opinion [from] you?

"A.  It occurred to me that Mr. [Horton] was very well versed in the legal system.  He's been in and out of prison.  He knew how to talk to us as detectives.  I took it as it wasn't his first time being interrogated or interviewed."

c. *Discussion.*

Horton contends there was ineffective assistance because defense counsel should have objected to Pelayo's testimony since it prejudiced him in the eyes of the jury.  We disagree because we conclude Horton was not prejudiced by what Pelayo said.

Evidence of a defendant's prior arrests or convictions is generally deemed unduly prejudicial and inadmissible.  "There is little doubt exposing a jury to a defendant's prior

criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580; see, e.g., *People v. Anderson* (1978) 20 Cal.3d 647, 650 ["it has long been held that evidence of an accused's prior arrests is inadmissible"].)

However, although "[a]n improper reference to a prior conviction may be grounds for reversal in itself . . . [such evidence may be] nonprejudicial 'in the light of a record which points convincingly to guilt.' " (*People v. Rolon* (1967) 66 Cal.2d 690, 693; compare *People v. Harris, supra,* 22 Cal.App.4th at p. 1581 [harmless where evidence of guilt was "overwhelming"] and *People v. Duran* (1969) 269 Cal.App.2d 112, 119 [harmless where evidence "convincingly pointed to defendant's guilt"] with *People v. Rolon, supra,* 66 Cal.2d at pp. 693-694 [not harmless where there were unimpeached alibi witnesses and the admitted perpetrator testified his accomplice had been someone else]) and *People v. Allen* (1978) 77 Cal.App.3d 924, 935 [not harmless because "an extremely close case"].)

This was not a close case. There was overwhelming evidence Horton intentionally refused to register Easley's residence because he did not want to put her Section 8 benefits at risk. Moreover, given the nature of the charges, the jury knew Horton had been convicted of a sex offense and thus must have had first-hand experience with the criminal justice system. During voir dire, the trial court told the jury the parties had stipulated Horton "has suffered a conviction of a crime that requires him to register as a sex offender." Horton argues that, although the jury knew he had suffered one prior conviction, "Sgt. Pelayo's comments portrayed him as a revolving door, career criminal, something quite different from a one time offender." We disagree. Pelayo's fleeting remark that Horton had been "in and out of prison" was far from devastating.

Because we conclude there is no reasonable probability Horton would have gained a more favorable outcome had an objection to Pelayo's remark been sustained (see *Williams v. Taylor, supra,* 529 U.S. at pp. 390-391), we hold Horton did not suffer ineffective assistance of counsel.

11

4. *Trial court did not err by excluding evidence of Price's opinion.*

Horton contends the trial court erred by excluding evidence that, in Detective Price's opinion, Horton should have been classified as a transient. This claim is meritless.

a. *Background.*

During Sgt. Pelayo's cross-examination, defense counsel asked if Detective Price, who had been present when Pelayo interviewed Horton, "indicated to you that he believed Mr. Horton was transient?" The trial court sustained a relevancy objection. When defense counsel kept posing the same question, the trial court said: "It's not relevant what the officer thinks under these circumstances."

Later, at sidebar, the trial court said that, if the defense wanted to have the jury hear Price's professional opinion regarding Horton's registration status, it should call Price as a witness rather than trying to smuggle in some passing comment he made during Horton's interview. The court ruled the evidence was not relevant, and was more prejudicial than probative under Evidence Code section 352: "It will mislead the jury because it's an opinion of . . . a fellow officer during the course of the interview. You're saying it goes towards the totality of the circumstances. The totality of the circumstances account for whether or not the officer decides to make an arrest, not for whether or not the case has been proven beyond a reasonable doubt . . . , whether or not the defendant . . . established [a] residence or not."

b. *Discussion.*

Horton argues Price's "opinion that Appellant was transient was clearly relevant to and supported Sgt. Pelayo's testimony that the determination of a sex offender's registration status involved subjectivity. That it was subjective reflected on the issue of whether or not Appellant was complying with the registration law, the ultimate issue in the case. One officer felt he was, another felt he wasn't. Without the evidence, the jury was left only with the testimony of Perez and Pelayo to the effect that Appellant was not in compliance with the registration law." Horton "contends that the exclusion of Det.

12

Price's opinion that he was a transient for purposes of the registration law violated his federal constitutional right to present a complete defense."

We are not persuaded. The trial court did not exclude all evidence of Price's opinion, but merely opposed defense counsel's attempt to introduce that opinion in the context of Pelayo's testimony about what might have been said during Horton's interrogation.

As the Attorney General points out, the trial court "recognized . . . the proffered statement was being taken out of context" and that "an officer who is conducting an interrogation might 'say any variety of things,' and that such statements were not relevant or admissible to prove a defendant's guilt or innocence." If Price had an opinion to offer on the issue of Horton's registration status that contradicted Pelayo's opinion, Horton was free to call him as a witness.

5. Romero *motion was properly denied.*

    a. *Legal principles*.

Horton contends the trial court abused its discretion by refusing to dismiss, under the authority of *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, the prior conviction used to double his sentence under the Three Strikes law. This claim is meritless.

The factors to be considered in ruling on a *Romero* motion were set forth in *People v. Williams* (1998) 17 Cal.4th 148, 161: "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . 'in furtherance of justice' pursuant to Penal Code section 1385(a), or in reviewing such a ruling, the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies."

13

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) "In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citation.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at pp. 376-377.) Hence, " '[w]here the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance' " (*Id.* at p. 378.)

        b. *Discussion*.

As a juvenile, Horton was found to have committed two felony offenses: receiving stolen property and taking a vehicle without the owner's consent (1994). His subsequent adult convictions included four felonies and three misdemeanors, including: taking a vehicle without the owner's consent (1996); forcible rape (1997); failing to register as a sex offender (2002); misdemeanor hit and run (2005); possession of firearm by a felon (2005); petty theft with a prior (2010); and, failing to appear (2011 and 2012). The trial court pointed to the consistency of Horton's criminal history as the primary reason for denying his *Romero* motion: "So [in] this court's estimation, it would be [an] abuse of discretion to grant a *Romero* motion as to that prior strike. There has been a continuing conduct. He suffered . . . three separate state-prison commitments, a couple of which were doubled because of the prior strike, and so the court is going to decline to exercise its authority under *Romero*."

Horton argues his "current offense was minor and technical.  The issue was simply where and how Appellant would register, not if he would."  Not so.  The trial record shows Horton was repeatedly informed of what he needed to do to comply with the registration law and that he simply chose not to do so.  In the trial court's words:  "I think he knew exactly what was going on.  It was kind of fudging a little bit because he didn't quite like what they were making him do.  [¶]  I understand that it was onerous and he couldn't register at the place he wanted to register at because his girlfriend was getting Section 8, so he was prevented from doing that, but bottom line is he had other options.  When he continued to go forward with this . . . he did know that he was in violation of the law and . . . ultimately it was going to turn out like this at some point."

The trial court did not err by denying Horton's *Romero* motion.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.

15