# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## SEPTEMBER 2020 TERM

**FILED**
**November 20, 2020**
**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

_____

No. 19-1132

_____

STATE OF WEST VIRGINIA EX REL.
JAMES CONLEY JUSTICE, II,
GOVERNOR OF THE STATE OF WEST VIRGINIA,
Petitioner

V.

THE HONORABLE CHARLES E. KING, JR.,
JUDGE OF THE CIRCUIT COURT OF
KANAWHA COUNTY, WEST VIRGINIA, AND
G. ISAAC SPONAUGLE, III,
Respondents

_____

PETITION FOR WRIT OF PROHIBITION

WRIT DENIED

_____

Submitted: October 14, 2020
Filed: November 20, 2020

Michael W. Carey
David R. Pogue
Carey, Scott, Douglas & Kessler, PLLC
Charleston, West Virginia

George J. Terwilliger, III
McGuire Woods LLP
Washington, District of Columbia
Attorneys for Petitioner

G. Isaac Sponaugle, III
SPONAUGLE & SPONAUGLE
ATTORNEYS AT LAW
Franklin, West Virginia
Attorney for Respondent

**ACTING CHIEF JUSTICE JENKINS delivered the Opinion of the Court.**

**CHIEF JUSTICE ARMSTEAD, deeming himself disqualified, did not participate in the decision of this case.**

**JUDGE BRIDGET COHEE, sitting by temporary assignment.**

**JUSTICE WORKMAN concurs and reserves the right to file a concurring opinion.**

**JUSTICE HUTCHISON dissents and reserves the right to file a dissenting opinion.**

**SYLLABUS BY THE COURT**

1. "A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W. Va. Code*, 53-1-1." Syllabus point 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977).

2. "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syllabus point 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1997).

3. "A writ of mandamus will not issue unless three elements coexist – (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syllabus point 2, *State ex rel. Kucera v. City of Wheeling*, 153 W. Va. 538, 170 S.E.2d 367 (1969).

4. "Mandamus lies to require the discharge by a public officer of a nondiscretionary duty." Syllabus point 3, *State ex rel. Greenbrier County Airport Authority v. Hanna,* 151 W. Va. 479, 153 S.E.2d 284 (1967).

5. "A non-discretionary or ministerial duty in the context of a mandamus action is one that is so plain in point of law and so clear in matter of fact that no element of discretion is left as to the precise mode of its performance." Syllabus point 7, *Nobles v. Duncil*, 202 W. Va. 523, 505 S.E.2d 442 (1998).

6. For purposes of the residency provision located in Section 1 of Article VII of the West Virginia Constitution, "reside" means to live, primarily, at the seat of government; and requires that the executive official's principal place of physical presence is the seat of government for the duration of his or her term of office. Residency, once established, is not lost through temporary absence. Rather, the controlling factor of residency is the intent to return to that principal place of physical presence.

7. The duty of executive officers to reside at the seat of government, as required by Section 1 of Article VII of the West Virginia Constitution, is a mandatory, non-discretionary duty for which a writ of mandamus may lie to require compliance with that duty.

**Jenkins, Acting Chief Justice:**

This Court is being asked to stop the Circuit Court of Kanawha County from enforcing a constitutional provision requiring the Governor of West Virginia to reside at the seat of government[1] during his or her term of office. Upon his inauguration, Petitioner, James Conley Justice, II, Governor of the State of West Virginia ("Governor Justice"), took an oath, in which he explicitly swore to "support the constitution" and to "faithfully discharge the duties of the office of Governor of the State of West Virginia." One of those duties that Governor Justice swore to uphold—a constitutional provision located at Section 1 of Article VII of the West Virginia Constitution—is a duty to "reside at the seat of government" during his term of office. However, Respondent, G. Isaac Sponaugle, III ("Mr. Sponaugle") alleges that Governor Justice is failing to uphold his constitutional duties because he refuses to comply with said provision.

This case was brought as a petition for a writ of prohibition[2] under the original jurisdiction of this Court by Governor Justice. Before this Court, Governor Justice challenges the circuit court's ruling,[3] and contends that (1) the circuit court is without

---

[1] The seat of government is Charleston. *See* W. Va. Const. art. VI, § 20.

[2] A writ of prohibition is "[a]n extraordinary writ issued by an appellate court to prevent a lower court from exceeding its jurisdiction or to prevent a nonjudicial officer or entity from exercising a power." Black's Law Dictionary (11th ed. 2019).

[3] *See* Section I, *infra*, for a discussion of the circuit court's order.

1

jurisdiction to issue a writ of mandamus[4] compelling him to reside in Charleston under the political question doctrine and corresponding separation of powers principles; and (2) the remedy of mandamus is not available to compel the Governor of the State of West Virginia to reside in Charleston because the circuit court's order denying the motion to dismiss is clearly erroneous as a matter of law. Mr. Sponaugle asserts the circuit court does have jurisdiction and has not exceeded its legitimate powers. Having considered the briefs submitted on appeal, the appendix record, the parties' oral arguments, and the applicable legal authority, we find that the circuit court does have jurisdiction to issue a writ of mandamus, and that Governor Justice fails to meet the standard for issuance of a writ of prohibition. Therefore, we deny Governor Justice's request for prohibitory relief.

## I.

## FACTUAL AND PROCEDURAL HISTORY

On June 18, 2018, Mr. Sponaugle[5] filed a petition for writ of mandamus against Governor Justice asking the Circuit Court of Kanawha County to order Governor Justice to reside at the seat of government during his term of office pursuant to Section 1 of Article VII of the West Virginia Constitution. Due to Mr. Sponaugle's failure to comply

---

[4] A writ of mandamus is "[a] writ issued by a court to compel performance of a particular act by a lower court or a governmental officer or body, usu. to correct a prior action or failure to act." Black's Law Dictionary (11th ed. 2019).

[5] Mr. Sponaugle is a member of the West Virginia House of Delegates. However, it should be noted that he filed the petition for writ of mandamus below as a private citizen, not in his official capacity as a delegate of the West Virginia Legislature.

2

with the pre-suit requirements of West Virginia Code § 55-17-3(a)(1) (eff. 2008), the petition was ultimately dismissed by the circuit court. After the dismissal of his petition by the circuit court, Mr. Sponaugle filed a petition for writ of mandamus before this Court, again seeking a writ directing Governor Justice to reside at the seat of government. This Court refused to issue a rule to show cause,[6] and, therefore, the writ sought by Mr. Sponaugle was denied.

On December 11, 2018, Mr. Sponaugle returned to the Circuit Court of Kanawha County and once again filed a petition for writ of mandamus directing Governor Justice to reside in Charleston. In his petition, Mr. Sponaugle contended that Governor Justice has not spent more than a "handful of nights" at the Governor's Mansion or at any other residence located within the State's seat of government, *i.e.* Charleston, since becoming Governor of the State of West Virginia. According to Mr. Sponaugle, Governor Justice has made consistent and repeated public remarks that he has not, is not, and will not reside in Charleston. Moreover, Mr. Sponaugle claimed that Governor Justice's failure to reside in Charleston has negatively impacted the efficient operations of state government.

---

[6] "A rule or order to show cause is one directing a party to appear and show cause why a certain thing should not be done; the process is civil and auxiliary, shortening the notice generally prescribed for ordinary motions." 60 C.J.S. Motions and Orders § 22.

In response, on February 19, 2019, Governor Justice filed a motion to dismiss the petition for writ of mandamus and argued that (1) mandamus cannot be employed to prescribe the manner in which a government official shall act; (2) a writ prescribing the amount of time the governor must spend in Charleston is contrary to the political question doctrine and corresponding separation of powers principles; (3) mandamus is not available to compel a general course of conduct; and (4) other adequate and more appropriate remedies exist.

By order dated July 17, 2019, the circuit court denied Governor Justice's motion to dismiss. In doing so, the circuit court ruled that mandamus is available to compel Governor Justice to comply with the constitutional provision. However, the circuit court's order did not contain findings of fact or conclusions of law to support its decision. Thereafter, on July 29, 2019, Governor Justice filed a motion requesting that the circuit court certify questions to this Court and to stay all further proceedings. In the alternative, Governor Justice asked the circuit court to enter an order setting forth findings of fact and conclusions of law in support of its decision to deny his motion to dismiss. Governor Justice stated that if the circuit court declined to certify questions, he intended to file a petition for writ of prohibition with this Court.

On October 21, 2019, the circuit court entered an order denying the motion to certify questions and granting the motion to stay further proceedings. Additionally, in the same order, the circuit court granted Governor Justice's motion for entry of an order

4

containing findings of fact and conclusions of law in support of its denial of the motion to dismiss. However, the circuit court stopped short of making a determination as to whether the duty to reside is a discretionary or non-discretionary duty. After this order was entered, Governor Justice filed the instant petition for writ of prohibition in this Court to challenge the circuit court's denial of his motion to dismiss.

## II.

## STANDARD FOR ISSUANCE OF WRIT

Governor Justice brings this action seeking a writ of prohibition under this Court's original jurisdiction. This Court has held that "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari." Syl. pt. 1, *Crawford v. Taylor*, 138 W. Va. 207, 75 S.E.2d 370 (1953). *See also* Syl. pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W. Va. 314, 233 S.E.2d 425 (1977) ("A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court. It will only issue where the trial court has no jurisdiction or having such jurisdiction exceeds its legitimate powers. *W. Va. Code*, 53-1-1.").

When evaluating extraordinary writs, "this Court reserves the granting of such relief to 'really extraordinary causes.' *State ex rel. Suriano v. Gaughan*, 198 W. Va. 339, 345, 480 S.E.2d 548, 554 (1996) (internal quotations and citations omitted)." *State ex*

5

*rel. Am. Elec. Power Co. v. Nibert*, 237 W. Va. 14, 19, 784 S.E.2d 713, 718 (2016). "Historically, we have limited our exercise of original jurisdiction in prohibition because it is an extraordinary remedy reserved for extraordinary cases. *See State ex rel. West Virginia Div. of Natural Resources v. Cline*, 200 W. Va. 101, 105, 488 S.E.2d 376, 380 (1997)." *State ex rel. Bobrycki v. Hill*, 202 W. Va. 335, 337, 504 S.E.2d 162, 164 (1998).

> For this reason, this Court will grant a writ of prohibition
>
> > to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

Syl. pt. 1, in part, *Hinkle v. Black*, 164 W. Va. 112, 262 S.E.2d 744 (1979), *superseded by statute on other grounds as stated in State ex rel. Thornhill Grp., Inc. v. King*, 233 W. Va. 564, 759 S.E.2d 795 (2014).

Finally, this Court set forth the standard for issuance of a writ of prohibition when it is alleged that a lower court has exceeded its legitimate authority:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error

6

or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1997). "In determining the third factor, the existence of clear error as a matter of law, we will employ a *de novo* standard of review, as in matters in which purely legal issues are at issue." *State ex rel. Gessler v. Mazzone*, 212 W. Va. 368, 372, 572 S.E.2d 891, 895 (2002).

With these standards in mind, we now examine Governor Justice's request for a writ of prohibition.

## III.

## DISCUSSION

Governor Justice seeks a writ of prohibition to prevent the circuit court below from granting a writ of mandamus under two theories. First, Governor Justice contends that, under the political question doctrine and corresponding separation of powers principles, the circuit court does not have jurisdiction to issue a writ of mandamus compelling him to comply with the constitutional residency requirement. Second, Governor Justice contends that, even if the circuit court had jurisdiction, it still erred in denying his motion to dismiss Mr. Sponaugle's petition for writ of mandamus. In support,

7

Governor Justice argues that mandamus is unavailable as a matter of law to compel residency at the seat of government because the duty to reside is a discretionary duty imposed upon the governor that cannot be controlled through mandamus.

Mr. Sponaugle rebuts these arguments and contends that the circuit court has jurisdiction over the subject matter contained within his petition for writ of mandamus. He argues that Governor Justice has failed to comply with the residency requirement—a non-discretionary constitutional duty—and that mandamus is available to ensure public officers are in compliance with such unequivocal, mandatory duties. Moreover, Mr. Sponaugle asserts that the circuit court did not exceed its legitimate powers in denying Governor Justice's motion to dismiss and that Governor Justice fails to meet the standard for issuance of a writ of prohibition by this Court.

In the present matter, the crux of this case turns on whether the circuit court has jurisdiction to issue a writ of mandamus and, if it does have jurisdiction, whether the circuit court has exceeded its legitimate powers in denying Governor Justice's motion to dismiss Mr. Sponaugle's petition for mandamus relief. In determining whether jurisdiction exists, we must first examine (1) whether the constitutional residency provision is a non-discretionary or discretionary duty; and (2) whether mandamus is proper to enforce compliance with said duty.

### A. Authority to Interpret Constitution

Before reaching the circuit court's jurisdiction, we must consider the context in which the present proceeding arises. That is, in order to determine the circuit court's jurisdiction, we must first examine the constitutional provision giving rise to this controversy, *i.e.* the residency requirement set forth in Section 1 of Article VII of the West Virginia Constitution. Challenges to constitutional language are not foreign to this Court. As the highest court in the State, it is clear that we are vested with the authority to review and interpret provisions of our State Constitution when presented with such cases and controversies. While this Court cannot and will not legislate, we will examine the Constitution's language, interpret it if necessary, and apply its provisions in a way that is consistent with the original purpose and understanding of the citizens at the time of the Constitution's ratification. In undertaking such action, this Court has stated that "[a]ny inquiry of constitutional application or interpretation fundamentally must begin with an examination of the actual language of the constitutional provision at issue." *State ex rel. Forbes v. Caperton*, 198 W. Va. 474, 479, 481 S.E.2d 780, 785 (1996) (internal citation omitted).

The first West Virginia Constitution was unanimously approved by the delegates to the First Constitutional Convention on February 18, 1862, and ultimately ratified by the citizens on March 26, 1863 ("West Virginia Constitution of 1863"). *See Chapter Eleven: West Virginia Constitutional Convention 1861-1863*, West Virginia Division of Culture and History, available at www.wvculture.org/history/statehood/

9

statehood11.html (last visited November 14, 2020). *See also West Virginia Statehood, June 20, 1863*, National Archives, available at https://www.archives.gov/legislative /features/west-virginia (last visited November 14, 2020).

In the West Virginia Constitution of 1863, Article V was dedicated to setting the framework for the executive branch of government. In particular, the framers included a provision requiring the Governor—and other executive officers—to reside at the seat of government.[7] *See* W. Va. Const. 1863 art. V, § 2. Then, in 1872, a second constitutional convention convened, and a new constitution was ratified by a vote of the citizens. The residency requirement was carried over to the new constitution and was placed in a new article containing provisions about the executive branch. Section 1 of Article VII of the West Virginia Constitution of 1872—the same constitution that governs the State today— adopted the residency requirement in its current format. This language currently provides, in full:

> The Executive department shall consist of a governor, secretary of state, auditor, treasurer, commissioner of agriculture and attorney general, who shall be ex officio reporter of the court of appeals. Their terms of office shall be four years, and shall commence on the first Monday after the

---

[7] More than twenty states have some type of constitutional and/or statutory residency provision for their governors. *See* Ala. Const. art. V, § 118; Ariz. Const. art. V, §1, version 2; Fla. Stat. Ann. § 14.01 (eff. 1995); Idaho Const. art. IV, § 1; Ill. Const. art. V, § 1; Ind. Const. art. VI, § 5; Md. Const. art. II, § 21; Mich. Const. art. V, § 24; Mont. Const. art. VI, § 1; Neb. Const. art. IV, § 1; Nev. Rev. Stat. Ann. § 223.040 (eff. 1866); N.M. Const. art. V, § 1; N.C. Const. art III, § 5; N.D. Const. art. V, § 1; S.C. Const. art. IV, § 20; Tex. Const. art. IV, § 13; Utah Const. art. VII, § 1; Va. Const. art. V, § 4; Wash. Const. art. III, § 24; W. Va. Const. art. VII, § 1; Wyo. Stat. Ann. § 9-1-101 (eff. 2018).

second Wednesday of January next after their election. They *shall reside at the seat of government* during their terms of office, keep there the public records, books and papers pertaining to their respective offices, and shall perform such duties as may be prescribed by law.[8]

W. Va. Const. art. VII, § 1 (amend. 1958) (emphasis and footnote added). This duty, expanded beyond the executive branch, is also codified in statute in the West Virginia Code:

> The governor, secretary of state, state superintendent of free schools, auditor, treasurer, attorney general and commissioner of agriculture, *shall reside at the seat of government* during their term of office, and keep there the public records, books and papers pertaining to their respective offices. Every judge of a circuit court shall, during his continuance in office, reside in the circuit for which he was chosen. Every county and district officer, except the prosecuting attorney, shall, during his continuance in office, reside in the county or district for which he was elected. And the removal by any such officer from the state, circuit, county

---

[8] The original version of Section 1 of Article VII of the West Virginia Constitution of 1872 stated:

> The Executive Department shall consist of a Governor, Secretary of State, State Superintendent of Free Schools, Auditor, Treasurer, and Attorney-General, who shall be, *ex officio*, Reporter of the Court of Appeals. Their terms of office, respectively, shall be four years, and shall commence on the fourth day of March, next after their election. They shall, except the Attorney-General, reside at the Seat of Government during their terms of office, and keep there the public records, books and papers, pertaining to their respective offices, and shall perform such duties as may be prescribed by law.

Later, in 1934, an amendment added the Agriculture Commissioner to the list of officials required to reside at the seat of government and made a change to require the Attorney General to also reside there. Another amendment in 1958 removed the State Superintendent of Free Schools.

11

or district for which he was elected or chosen shall vacate his office.

W. Va. Code § 6-5-4 (eff. 1909) (emphasis added).

When confronted with issues of constitutional law,

> although this Court is vested with the authority "to construe, interpret and apply provisions of the Constitution, . . . [we] may not add to, distort or ignore the plain mandates thereof." *State ex rel. Bagley v. Blankenship*, 161 W. Va. 630, 643, 246 S.E.2d 99, 107 (1978). "If a constitutional provision is clear in its terms, and the intention of the electorate is clearly embraced in the language of the provision itself, this Court must apply and not interpret the provision." Syl. pt. 1, *State ex rel. Trent v. Sims*, 138 W. Va. 244, 77 S.E.2d 122 (1953).

*State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 231 W. Va. 227, 243, 744 S.E.2d 625, 641

(2013).

Moreover,

> it is not this Court's duty to legislate; nor were we elected to make political decisions based upon what we believe to be the expedient answer to this situation. Instead, we are charged with the task of interpreting the Constitution and the laws of this State as they exist. A judicial system that substitutes its beliefs for the constitutional principles of its people is a mockery of justice.

*Meadows on Behalf of Prof'l Emps. of W. Va. Educ. Ass'n v. Hey*, 184 W. Va. 75, 77, 399

S.E.2d 657, 659 (1990).

12

We also have stated that "[t]he provisions of the Constitution, the organic and fundamental law of the land, stand upon a higher plane than statutes, and they will as a rule be held mandatory in prescribing the exact and exclusive methods of performing the acts permitted or required." Syl. pt. 2, *Simms v. Sawyers*, 85 W. Va. 245, 101 S.E. 467 (1919). *See also Harbert v. Cty. Court*, 129 W. Va. 54, 61-62, 39 S.E.2d 177, 184 (1946) ("The Constitution of this State is the supreme law of West Virginia[.] . . . The Constitution of West Virginia is binding upon all the departments of government of this State, all its officers, all its agencies, all its citizens and all persons whomsoever within its jurisdiction. The three branches of our government, the legislative, the executive, and the judiciary, alike derive their existence from it; and all of them must exercise their power and authority under the Constitution solely and strictly in accordance with the will of the sovereign, the people of West Virginia, as expressed in that basic law. It is the solemn duty of this Court, its creature, to obey and give full force and effect to all its terms and provisions.").

Having reaffirmed that this Court has the authority to review and interpret our State constitution, we now turn to the issue of jurisdiction.

### B. Jurisdiction to Issue Writ of Mandamus

This Court has long held that "[a] writ of mandamus will not issue unless three elements coexist – (1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl. pt. 2, *State ex rel. Kucera v. City of*

13

*Wheeling*, 153 W. Va. 538, 170 S.E.2d 367 (1969). In this case, in its order denying Governor Justice's motion to dismiss, the circuit court found the following: (1) Mr. Sponaugle was a private citizen and taxpayer of the State of West Virginia; (2) Mr. Sponaugle sufficiently pled and provided theories under which relief could be granted (*i.e.* the West Virginia Constitution and West Virginia Code impose a residency requirement on the governor and other elected officials); and (3) Mr. Sponaugle's alternative remedies—waiting for a future election or waiting for an impeachment procedure to take place—were not as equally convenient, beneficial, or effective as this mandamus action.

Below, Mr. Sponaugle alleged that the Governor has a legal duty to abide by the constitutional and statutory residency provision. While Governor Justice acknowledges that the Constitution contains such a provision, he argues that the duty is discretionary—a determination that the circuit court avoided making.

In framing the issue before us in this writ of prohibition, we must disentangle the terms mandatory and non-discretionary. At first, the terms appear synonymous; however, they have not been ascribed the same meaning under our mandamus jurisprudence concerning public officials. A duty is mandatory if the official has no discretion *not* to perform the duty, and here it is apparent that the language of the Constitution gives the Governor and other executive officers no leeway *not* to reside at the seat of government.

14

Under our Constitution and Code, the language plainly states that the Governor "shall" reside in Charleston. "It is well established that the word 'shall,' in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation." Syl. pt. 1, *Nelson v. W. Va. Pub. Employees Ins. Bd.*, 171 W. Va. 445, 300 S.E.2d 86 (1982).[9] *Accord* Syl. pt. 1, *Underwood v. Cty. Comm'n of Kanawha Cty.*, 176 W. Va. 740, 349 S.E.2d 443 (1986). Specific to constitutional provisions, we have held that "[a]s used in constitutional provisions, the word 'shall' is generally used in the imperative or mandatory sense." Syl. pt. 3, *State ex rel. Trent v. Sims,* 138 W. Va. 244, 77 S.E.2d 122 (1953).

The constitutional and statutory language *sub judice* is plain, and undoubtedly sets forth a mandatory constitutional duty with which the Governor must

---

[9] In fact, this Court has noted that

[o]ur statutory law does not contemplate that officers of the executive branch of government, after taking their oath, W.Va. Const. art. 4, § 5; W. Va. Code § 6-1-3 (1979 Replacement Vol.), will knowingly disregard their duty to faithfully execute the law. It is implicit in our system of government that public officers will perform their duties in accordance with statute. Indeed, the constitution explicitly contemplates and mandates that public officers "*shall* perform such duties as may be prescribed by law." (Emphasis added.) W. Va. Const. art. 7, § 1.

*Nelson v. W. Va. Pub. Employees Ins. Bd.*, 171 W. Va. 445, 451, 300 S.E.2d 86, 92 (1982).

15

comply during his or her term of office. In fact, this Court already has found that this constitutional provision in particular is a mandatory duty imposed upon the Governor:

> It was [the Governor's] duty to do so, in fidelity to his oath of office to support the constitution of the State; and the constitution of the State *unequivocally requires* that he *shall reside at the seat of government* during his term of office, and keep there the public records of his office, and commands him, as the chief executive officer, in whom is vested the chief executive power, to "take care that the laws be faithfully executed."

*Slack v. Jacob*, 8 W. Va. 612, 657 (1875) (emphasis added).

In an almost identical analysis of constitutional duties, the Supreme Court of Washington held:

> The state constitution, framed by a specially called constitutional convention and adopted by vote of the people in 1889 in accordance with the provisions of the enabling act, contains several references to the "seat of government". Article III, § 24, providing for the location of the executive departments of the state created by Article III, § 1, says:
>
> > "The governor, secretary of state, treasurer, auditor, superintendent of public instruction, commissioner of public lands and attorney general shall severally keep the public records, books and papers relating to their respective offices, at the seat of government, at which place also the governor, secretary of state, treasurer and auditor shall reside."
>
> Like all other sections of our state constitution these provisions are mandatory since the section contains no express declaration to the contrary. Art. I, § 29.

*State ex rel. Lemon v. Langlie*, 45 Wash. 2d 82, 97, 273 P.2d 464, 472-73 (1954).

16

The Governor does not dispute that he, and other executive officials enumerated in Section 1 of Article VII have a mandatory duty to reside at the seat of government. Rather, he contends that the term "reside" is subject to his own discretion. He argues that the judiciary, in employing mandamus, would require him to be physically present at the seat of government and that such directive would infringe on the separation of powers and violate the political question doctrine should it attempt to dictate his "residence." In other words, the Governor argues that "reside" is a discretionary duty and that he must be able to come and go as the duties of his office require without interference or regulation from the courts. And, that he is physically present in Charleston as often as he needs to be "as determined by the judgment, autonomy, and discretion inherent in his office." We agree that, if mandamus were to regulate the comings and goings of the Governor, such action would violate separation of powers principles. We disagree, however, that "residing" is a matter of discretion, and we also disagree that granting mandamus to enforce the Governor's mandatory duty to reside in Charleston would take the form of regulating the comings and goings of the Governor. In reaching this conclusion, we first examine Governor Justice's contention that "reside" is a discretionary duty. In several jurisdictions,[10]

---

[10] *See, e.g.*, *State ex rel. Turner v. Henderson*, 74 So. 344 (Ala. 1917); *Winsor v. Hunt*, 243 P. 407 (Ariz. 1926); *Elliott v. Pardee*, 86 P. 1087 (Cal. 1906); *Greenwood Cemetery Land Co. v. Routt*, 28 P. 1125 (Colo. 1892); *Martin v. Ingham*, 17 P. 162 (Kan. 1888); *Cochran v. Beckham*, 89 S.W. 262 (Ky. 1905); *Magruder v. Swann*, 25 Md. 173 (1866); *State ex re. Danaher v. Miller*, 160 P. 513 (Mont. 1916); *State ex rel. Wright v. Savage*, 90 N.W. 898 (Neb. 1902); *State ex rel. White v. Dickerson*, 113 P. 105 (Nev. 1910); *Cotton v. Ellis*, 52 N.C. 545 (1860); *State ex rel. Watkins v. Donahey*, 110 Ohio St. 494,

17

the courts have applied, or at least recognized, the rule that mandamus will lie to compel the governor to perform an act which is of a ministerial nature, where he has no discretion in the matter and his duty to perform the same is clear, if there is no other adequate legal remedy for the protection of the rights of the public or third parties who have an interest in such performance.

105 A.L.R. 1124 (originally published in 1936). It also is well-settled law in this State that "[m]andamus lies to require the discharge by a public officer of a nondiscretionary duty." Syl. pt. 3, *State ex rel. Greenbrier Cty. Airport Auth. v. Hanna,* 151 W.Va. 479, 153 S.E.2d 284 (1967). *Accord Nobles v. Duncil*, 202 W. Va. 523, 505 S.E.2d 442 (1998); *Delardas v. Cty. Court of Monongalia Cty.*, 155 W. Va. 776, 186 S.E.2d 847 (1972). *See also Walter v. Ritchie*, 156 W. Va. 98, 110, 191 S.E.2d 275, 282 (1972) ("Mandamus will lie to compel performance of a *nondiscretionary* duty of an administrative officer though another remedy exists, where it appears that the official, under misapprehension of law, refuses to recognize the nature and scope of his duty and proceeds on the belief that he has discretion to do or not to do the thing demanded of him." (emphasis added)). Additionally,

> "[m]andamus is a proper remedy to compel tribunals and officers exercising discretionary and judicial powers to act, when they refuse so to do, in violation of their duty, but it is never employed to prescribe in what manner they shall act, or to correct errors they have made." Syllabus Point 1, *State ex rel. Buxton v. O'Brien,* 97 W. Va. 343, 125 S.E. 154 (1924).

Syl. pt. 8, *Nobles*, 202 W. Va. 523, 505 S.E.2d 442.

---

144 N.E. 125 (1924); *Gantenbein v. West*, 144 P. 1171 (Or. 1915); *State ex rel. Irvine v. Brooks*, 84 P. 488 (Wyo. 1906).

18

As such, while mandamus may lie against a public official to cause that official to *act* in accordance with a mandatory duty, if the performance of that duty requires an exercise of discretion, mandamus may direct that the duty be performed, but it may not be used to direct the *manner* in which a public official performs the duty. Ordinarily, the posture of a writ of prohibition would require our analysis to stop here, where we conclude that mandamus may be employed to require the discharge of both discretionary and non-discretionary duties, and remand to the circuit court for it to determine whether the duty to reside is discretionary or non-discretionary. However, in this particular case, the propriety of mandamus against an officer of another branch of government is actually premised on the existence of discretion insofar as the Governor contends regulation of that discretion through mandamus infringes on separation of powers principles. For that reason, in determining whether mandamus may lie at all as a matter of law, we must also examine whether the duty to reside involves discretion.

Governor Justice argues that "reside" is a vague term that means different things in different contexts and that, therefore, the word is incapable of definition that is devoid of discretion because "to reside" is a course of conduct, not a discrete act. Stated differently, the Governor contends that the courts may not dictate that the Governor "reside" at the seat of government because the Governor must come and go as the demands of his office require in the exercise of his discretion.

While we recognize that the word "reside" does not necessarily have a precise definition, we find that the meaning and import of this word can be understood by examining the understanding of the citizens who ratified our Constitution. The word "reside" is a word that is frequently included in constitutions, statutes, and court rules; yet, the word is often left undefined. It is surmised that "reside" is usually left undefined because its legal meaning is no different than the meaning in everyday use.

However, to the extent the Governor argues that interpretation of "reside" is subject to his own discretion because it is *ambiguous*, as opposed to discretionary, we note at the outset that any *ambiguity* in the term "reside" as it is used in the Constitution is a matter for resolution and definition by this Court, not the executive branch. Our Constitution does not define the word "reside" in relation to this provision or elsewhere in the Constitution where the term or any derivative of it is employed. Accordingly, we turn to the context and purpose of Section 1 of Article VII of the West Virginia Constitution, and the prior versions from which it evolved, for guidance.

*1.      The West Virginia Constitutions of 1863 and 1872.* On November 26, 1861, the delegates met in Wheeling for what is now known as the First West Virginia Constitutional Convention. *See Chapter Eleven: West Virginia Constitutional Convention 1861-1863*, West Virginia Division of Culture and History, available at www.wvculture.org/history/statehood/statehood11.html (last visited November 24, 2020). *See also West Virginia Statehood, June 20, 1863*, National Archives, available at

https://www.archives.gov/legislative/features/west-virginia (last visited November 14, 2020).

While various issues regarding the contents of the constitution for our newly emerging State were taken up during this convention, the one that is relevant to this case was addressed on February 4, 1862, when the delegates met and discussed a constitutional provision that the Governor "shall reside at the seat of government." The debates of February 4, 1862, as to that provision revolved primarily around determining the appropriate salary for the Governor, given the stature and duties of the office including, as Delegate Battelle put it, "receiving and entertaining a great deal of company, a great many strangers who will come to him—parties, individuals, companies, associations or their officers—seeking information as to the geography or resources of the country[.]"

While there was no debate specifically relating to the requirement that the Governor reside at the seat of government, debates as to the appropriate salary provide clear insight into what the framers were requiring of the Governor in using the term reside. In support of an increased salary, Delegate Van Winkle discussed the additional financial obligations required of the Governor as opposed to other officers and stated "*[h]e must remove to the seat of government and remain there permanently. He has got to provide his own house* and that of better quality than most of us have occasion to in our private houses. Strangers of distinction have to be entertained by the governor." *See February 4, 1862, Debates and Proceedings of the First Constitutional Convention of West Virginia*,

West Virginia Division of Culture and History, available at http://www.wvculture.org/history/statehood/cctoc.html (last visited November 14, 2020) (emphasis added).

In defending the salary provision, Delegate Brown of Kanawha County commented:

> I concur with the gentleman from Wood. I desire to see this State, if it ever is a State, a respectable and decent State; and I desire to see officers, whoever they may be, representative of the State, live in the style they should, *the governor at the capital so we may at least find him*, with a salary that he can give one his breakfast and entertain with at least the decency an ordinary private citizen can.

Delegate Brown continued, "What gentleman with the dignity and character to fit him for the position would be willing *to go to your capital and keep open house* and try to do it on the salary you propose . . . . whether much or little *he is required to live at the capital* and support a style of living creditable to the State."

In that same discussion, Delegate Sinsel posited that it would take all of the Governor's time to be governor of this new, smaller state, the same as it would in bigger states. In response, Delegate Stevenson, who proposed a reduced salary for the Governor refuted, "[w]hy, he may not stay here all the time. A man can reside here at the seat of government if he sees proper and if his official business only occupies his attention one month in the year, he has got eleven months that he can occupy himself at something else." The inference of Delegate Stevenson's comment, and further comment that the governor

22

may "turn his attention sometimes, in the infancy of our State, to some other matters that may assist him to get a living" being that at the time, gubernatorial governance of the then non-state of West Virginia was perhaps not a full-time occupation. To that point, Delegate Battelle countered that

> the man you elect governor under this Constitution will have actually more work to do ten-fold . . . I need only refer in proof of this to the condition of our territory and the condition it is likely to be in for months and, I may say, years to come.

Delegate Stevenson's motion to lower the salary of the Governor was rejected by a vote of 30-11.

The constitutional provision that resulted from this debate directed the Governor to reside at the seat of government and approved a salary of two thousand dollars per year. *See* W. Va. Const. art. V, § 2 (1863). *See also id*. at art. IV, § 22 ("The seat of Government shall be at the City of Wheeling, until a permanent Seat of Government be established by law."). The approved constitution further contained a provision to divest the Governor of the authority of his office and to vest it in the President of the Senate should the Governor remove himself from the seat of government. *See* W. Va. Const. art. V, § 6 (1863). Suffice it to say it was so important to the framers that their State's chief executive reside at the seat of government, that not only did the Governor's salary incorporate funds to relocate to the seat of government and to purchase a residence at the seat of government, but the Governor would also be relieved of his duties if he removed himself from the seat of government.

23

In January of 1872, a new constitutional convention convened. The substantial constitutional revisions, which were ratified in April 1872, nonetheless maintained the requirement that the Governor "shall . . . reside at the Seat of Government" during the term of office and additionally imposed the same residency requirement for other officers of the executive branch.[11] But, it did not incorporate an automatic divestment of gubernatorial authority if the Governor removed himself from the seat of government.[12] The 1872 Constitution also included the requirement that executive officers "keep there [at the seat of government] the public records, books and papers, pertaining to their respective offices[.]" Unfortunately, the debates were not documented for the public record. Nevertheless, having laid out the context in which the duty to reside was cultivated, we now turn to what the duty to reside entails, or was intended to entail, by the electorate who ratified this constitutional provision.

History and the intent of the framers is afforded due consideration—and it should be noted that both this history and the logic that ensues from these debates dictate the same result. It is obvious that the framers of the 1863 Constitution, and later the 1872

---

[11] *See supra* note 8.

[12] *Compare* W. Va. Const. art. V, § 6 (1862) with W. Va. Const. art. VII, § 16 (1872). We do not read the elimination of the provision for automatically vesting authority in the President of the Senate should the Governor remove himself from the seat of Government to mean that the duty to reside at the seat of Government is any less mandatory; rather, we consider that such an automatic removal provision was perhaps a bit drastic given that compliance with the residency requirement could be readily corrected.

Constitution, required the Governor and other executive officers to reside at the seat of government for a reason. At the time the 1872 Constitution was approved by the convention and ratified by the electorate, the state had not yet purchased a residence for the Governor at the seat of government,[13] but Governors of the State were nonetheless required to house themselves as they had done under the 1863 Constitution. If the 1872 framers intended that location of the Governor's *office*, itself, at the seat of government was sufficient to meet the residency requirement, then it can be concluded that keeping the records of the office there accomplishes that purpose and the imposition of a duty on the Governor, himself, to *reside* at the seat of government would be superfluous. In other words, there is no need for *both* a provision requiring the office of the Governor to be at the seat of government *and* a provision requiring the Governor to reside at the seat of government if the two directives accomplish the same goal. The existence of these two distinct directives, then, makes it clear that residence at the seat of government was not intended to be in the name of the Governor's office only. Rather, the State's eventual purchase of an Executive Mansion for the Governor's dwelling evidences a distinct intent

---

[13] An Executive Mansion was first purchased by the state in 1893. *See West Virginia Executive Mansion*, West Virginia Legislature, https://www.wvlegislature.gov/Educational/Capitol_History/pg8.cfm (last visited November 14, 2020). *See also*, *National Register of Historic Places Inventory – Nomination Form, Capitol Complex and West Virginia Executive Mansion*, Department of the Interior National Park Service, available at http://www.wvculture.org/shpo/nr/pdf/kanawha/74002009.pdf (last visited November 14, 2020) ("This new governor's home was the second owned by the state; the first had been purchased only in 1893 from a firm which had constructed a house just a few years before for a private residence.").

that the residency of the Governor, himself, at the seat of government also is required by our State Constitution.[14]

Further, the text of the debates from the 1862 Constitutional Convention are clear that the delegates intended the Governor to *live* at the seat of government, not merely maintain an office there or have transitory presence. While we do not have the benefit of the 1872 debates, we are mindful that, at the time of ratification, transportation was limited and the technology that keeps us connected today in the twenty-first century was not available to the individuals leading our State in the late 1800s. Undoubtedly, the citizens who ratified our Constitution desired to have the leaders of our executive branch—including the Governor—live in a central location to provide for an efficient, present, and unified government. We recognize that such a provision might not be included if a new constitution were to be drafted in today's world, with today's conveniences, technology, and modes of transportation. But it is not for this Court to speculate what this provision means in the context of our current society. Rather, in spite of the conveniences of travel and communications that we currently enjoy, we nevertheless are tasked with reviewing and interpreting our Constitution's residency provision in accordance with the original meaning intended at the time of its ratification. In doing so, we ask ourselves: What logical

---

[14] We do not mean this to imply that the Constitution requires the Governor to live in the Executive Mansion; the Constitution itself does not encompass that specific requirement. It is clear, however, that the Executive Mansion was purchased as a home for the Governor.

26

purpose could it have served for the West Virginia Constitution of 1872 to require that the records of executive offices are to be kept at the seat of government, if executive officers, themselves, need not reside there, to create and use the very same records?

Insofar as Governor Justice argues in this case that he is "residing" at the seat of government purely because he maintains an office in Charleston and is physically present there as often as he needs to be to conduct the State's business, we find this argument to be inconsistent with the express intent of Section 1 of Article VII of the West Virginia Constitution.

2.     *"Reside" in the Context of Mandamus.*   As previously discussed, there was no debate as to the specific meaning of "reside" at the 1862 Constitutional Convention. However, we can infer from the context of the debates regarding the Governor's salary that the framers who drafted the Constitution and the citizens who ratified it desired to have the Governor, the chief executive officer of this State, live at the seat of government for the duration of his term to ensure that the head of our government was visible, available, and accessible to the people to promote the efficient operations of government.[15] While the word "reside" is not defined in either the 1863 or 1872

---

[15] In discussing a similar constitutional provision, the Supreme Court of Maryland looked to the intent of its framers and citizens who ratified its constitution, and found that the purpose of the provision

> was the desirability of having the governor, as the Chief
> Executive of the State, live at the seat of the state government

27

Constitutions, the historical context and convention debates suggest that the term is intended to be afforded its common, ordinary meaning.

We observe that the term "reside," while so often used, is likewise often left undefined "because its legal meaning is no different than the meaning in everyday use. In determining the definition of 'reside' or 'residence' use your common sense and logic and use the ordinary, everyday meaning of the word." *People v. Gonzales*, 183 Cal. App. 4th 24, 35 (2010).

> There is little doubt that the terms "reside," "residence" and "domicile" have been somewhat puzzling to the Courts, text-writers and lexicographers not only in this country but throughout the world. Kennan, *Residence and Domicile*, Ch. 1. Some states have made statutory definitions of one or more of the terms; but, where there is none, all Courts seem to agree that they must be construed in accordance with the context and the purpose of the constitution, charter, statute or instrument in which they are found.

---

> to promote an efficient and expeditious conduct of the State's affairs. Annapolis was and is the State Capital; there the General Assembly meets, as do other departments of the executive, judicial and legislative branches of the government; and there much of the day to day business of the State is transacted. By requiring the Governor to live in Annapolis during his term of office, the framers of the Constitution were merely seeking to insure that the Chief Executive would be available at all reasonable times in Annapolis, and to prevent the establishment of a *de facto* seat of government in the governor's "home town."

*Gallagher v. Bd. of Sup'rs of Elections*, 219 Md. 192, 202-03, 148 A.2d 390, 395-96 (1959).

*Gallagher v. Bd. of Sup'rs of Elections*, 219 Md. 192, 202, 148 A.2d 390, 396 (1959). While the term "reside" is perhaps *so* simplistic a concept that it does not require a comprehensive definition, the requirement that the Governor "reside" at the seat of government set forth in this constitutional provision does not suggest that "to reside" is a duty so laden with discretion that it cannot be enforced through mandamus.

Specifically, "residing" is not a matter of *discretion*, but rather one of *intent*—specifically, the intent to return to a certain place. As we previously have held when considering the meaning and effect of "residence," "[t]he controlling factor is the intent, as evinced primarily by the acts, of the person whose residence is questioned. If an absence from a residence is intended to be temporary, it does not constitute an abandonment or forfeiture of the residence." *Farmers Mut. Ins. Co. v. Tucker*, 213 W. Va. 16, 24, 576 S.E.2d 261, 269 (2002).

To the extent the Governor suggests "reside" in the context of this constitutional provision is incapable of a definition that does not seek to control his executive discretion, we disagree. We now hold that, for purposes of the residency provision located in Section 1 of Article VII of the West Virginia Constitution, "reside" means to live, primarily, at the seat of government and requires that the executive official's principal place of physical presence is the seat of government for the duration of his or her term of office. Residency, once established, is not lost through temporary absence. Rather,

29

the controlling factor of residency is the intent to return to that principal place of physical presence.

The seat of government is so named for the purpose of convening the government in one place to ensure that the government runs smoothly and efficiently and that matters of distance or disconnectedness would not serve to disrupt that efficiency. Certainly, the Governor, like other executive officials, exercises his duties outside the confines of the seat of government; it is, after all, a statewide office with the majority of the State being located outside the seat of government. Therefore, it goes without saying that complying with a constitutional provision to reside at the seat of government does not require officials to never step outside Charleston city limits as the Governor seemingly implies. Rather, this provision simply requires the seat of government to be the elected official's primary place of physical presence so as to ensure the smooth operation of government both within the executive branch itself and among all branches of government, all of which are reposed at the seat of government.

Indeed, public officials may come and go from the seat of government as they please, at their discretion, as the needs of the office or their personal situations require. But, executive officials who must comply with the duty to reside at the seat of government for the duration of their term must establish the seat of government as their "home base,"

so to speak.[16]  That is, the official may travel *from* the seat of government, *to* other places but *with the intent to return to the seat of government*.  So, in requiring those officials to comply with the constitutional duty to reside at the seat of government, mandamus does not take the form of directing the Governor to sleep a certain number of nights per year at the Governor's Mansion, nor does it direct the Governor to track how many days he spends traveling to other parts of the State to negotiate business interests, to survey areas impacted by natural disasters, or to conduct any other affairs of the State.  Rather, mandamus simply requires the enforcement of the already-mandatory and already-direct language of the Constitution requiring executive officials to reside at the seat of government.

As mentioned above, this Court has the authority to review and interpret the Constitution, and from our consideration of the original meaning, context, and purpose that the citizens understood this provision to require, it is readily apparent that the intention of the electorate was to mandate the residence of executive officials at the seat of government for the duration of their terms. We are not vested with the authority to add to, distort, or ignore such a plain mandate.  Mandamus, in its purest form, simply requires the official to perform the duty required of him.  Indeed, mandamus, should it lie here, does not seek to infringe on the discretion of the office; it merely mandates compliance with a plain

---

[16] That the seat of government was intended as "home base" for executive operations is reinforced by the corresponding requirement that the "public records, book and papers pertaining to their respective offices" be kept at the seat of government.

directive of the electorate of the State of West Virginia that its Governor reside at the seat of government, which is Charleston.

For these reasons, we disagree that requiring officers of the executive branch to comply with their constitutional mandate to reside at the seat of government involves judicial regulation of their discretion in discharging the duties of their office such that mandamus, as a matter of law,[17] would be improper under separation of powers principles.[18] Accordingly, we hold that the duty of executive officers to reside at the seat

---

[17] The question we answer is only whether mandamus may lie at all as a matter of law. Whether there is another adequate remedy apart from mandamus such that mandamus should not issue in this case is a question for the circuit court. *See Trumka v. Moore*, 180 W. Va. 284, 287, 376 S.E.2d 178, 180 (1988):

> "[a] writ of mandamus will not issue unless three elements coexist—(1) a clear legal right in the petitioner to the relief sought; (2) a legal duty on the part of respondent to do the thing which the petitioner seeks to compel; and (3) the absence of another adequate remedy." Syl. pt. 2*, State ex rel. Kucera v. City of Wheeling*, 153 W.Va. 538, 170 S.E.2d 367 (1969). However, we have also recognized that "[w]hile it is true that mandamus is not available where another specific and adequate remedy exists, if such other remedy is not equally as beneficial, convenient, and effective, mandamus will lie." Syl. pt. 4, *Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981); *see also United Mine Workers of America v. Miller*, 170 W.Va. 177, 291 S.E.2d 673, 677 (1982); *United Mine Workers of America v. Scott*, 173 W.Va. 356, 315 S.E.2d 614, 621 (1984).

[18] We vehemently disagree that mandamus to require the Governor to reside at the seat of government bears any relation whatsoever to a political question. Initially we note that mandamus in this context and as discussed in our analysis of the separation of powers applies not only to the Governor, but to all executive officers enumerated in the constitutional provision at issue who may or may not be members of the same party. The propriety of mandamus as addressed by this Court is not a question of politics, but an

of government, as required by Section 1 of Article VII of the West Virginia Constitution, is a mandatory, non-discretionary duty for which a writ of mandamus may lie to require compliance with that duty.

Finally, because we find the residency provision to be a non-discretionary duty enforceable through mandamus, we find that it was not clear error for the circuit court to deny Governor's Justice's motion to dismiss Mr. Sponaugle's petition for such relief. Governor Justice contends that issuing a writ of mandamus is clearly erroneous because—among other reasons—any imaginable remedy would be "not only manifestly inappropriate, but also impractical and unmanageable." However, it has been observed, that,

> [a]lthough the difficulty or impracticability of enforcement of the writ of mandamus against the governor, should one be granted, and the possible confusion in the affairs of the state which might attend any such enforcement, have not infrequently been referred to by the courts as a reason for refusing to issue the writ, other courts have taken the position that this is not a valid reason for denial of the writ in an otherwise proper case. In some cases the court, in awarding a writ of mandamus against the governor, has refused to enter upon the inquiry as to how its commands would be enforced, taking the position that it would be assumed that such a question would not arise, and that the sole purpose of the governor may have been to obtain a judicial construction, or

---

affirmation of "this Court's constitutional mandate to apply the laws as written." *State ex rel. Biafore v. Tomblin*, 236 W. Va. 528, 537, 782 S.E.2d 223, 232 (2016). The duty to reside applies to the constitutional office of the Governor, secretary of state, auditor, treasurer, commissioner of agriculture, and attorney general regardless of the partisanship of its occupant and does not present a political question merely because it was brought before us by a member of a particular political party.

determination of the questions involved in the mandamus proceeding.

The inference may be drawn from the cases as a whole that the difficulty or impracticability of enforcement of the writ of mandamus, should the governor fail to obey it, should not be deemed of itself a valid reason for refusing such relief, although it is an argumentative ground for the position that the courts should not undertake to coerce or control the chief executive by mandamus.

105 A.L.R. 1124 (originally published in 1936).

We acknowledge that the enforcement of a writ of mandamus against a governor is not commonplace.[19] However, as evidenced above, the rarity of this legal

---

[19] The authority of our Court's jurisdiction to issue a writ of mandamus against a governor was addressed in *Dadisman v. Moore*, 181 W. Va. 779, 384 S.E.2d 816 (1988). In *Dadisman*, this Court was tasked with determining whether a writ of mandamus could be brought against various officials of the executive and legislative branches to ensure proper funding of the Public Employees Retirement System ("PERS") and to require the Governor to include a specified appropriation for PERS in the proposed budget. The Court stated:

It has long been the law in West Virginia that "[a] peremptory writ of mandamus will issue to require the discharge by a public official of a non-discretionary duty." Syl. Pt. 4, *Glover v. Sims*, 121 W. Va. 407, 3 S.E.2d 612 (1939). It is the duty of the Governor to prepare for the Legislature a budget consistent with statutory law and our Constitution, W.Va. Const. art. VI, § 51, and failure to do so supports issuance of a writ of mandamus. *See State ex rel. Brotherton v. Moore*, 159 W. Va. 934, 230 S.E.2d 638 (1976). The Governor, therefore, must hereafter include in his proposed budget an appropriation for the PERS at least equal to that certified to him by the Trustees. This represents payment to the trust for the services rendered by State employees.

34

action and the speculative nature of the enforcement of remedies that may result does not mean that courts should not—or are without authority to—issue writs of mandamus against public officials. The public has a reasonable expectation that its elected officials will uphold the duties of their offices/positions and follow the law, and writs of mandamus to compel compliance with these obligations will be issued when deemed necessary by the courts. Accordingly, given the high standard for the issuance of a writ of prohibition by this Court, Governor Justice has failed to meet his burden to show that the circuit court exceeded its legitimate powers. He has not shown that the circuit court clearly erred in denying his motion to dismiss the petition for writ of mandamus, and as such, the petition for writ of prohibition must be denied.[20]

---

181 W. Va. at 787, 384 S.E.2d at 824. *See, e.g.*, *State ex rel. Biafore v. Tomblin*, 236 W. Va. 528, 537, 782 S.E.2d 223, 232 (2016); *Trumka v. Moore*, 180 W. Va. 284, 287, 376 S.E.2d 178, 180 (1988).

[20] While he primarily relies upon the third *Hoover* factor, Governor Justice also contends, without analysis, that the remaining four *Hoover* factors weigh in his favor. Because Governor Justice fails to argue or adequately brief his position as to the remaining four *Hoover* factors, we decline to address them.

> "In the absence of supporting authority, we decline further to review [these] alleged error[s] because [they] have not been adequately briefed." *State v. Allen*, 208 W. Va. 144, 162, 539 S.E.2d 87, 105 (1999). As we stated in *State, Dept. of Health v. Robert Morris N.*, 195 W. Va. 759, 765, 466 S.E.2d 827, 833 (1995), "'[a] skeletal "argument," really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.'" (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Furthermore, this Court has adhered to the rule that "[a]lthough we liberally construe briefs in determining issues presented for review, issues . . . mentioned only in passing but [which] are not supported with pertinent authority, are not considered on

## IV.

## CONCLUSION

For the reasons set forth above, we conclude that the Circuit Court of Kanawha County had jurisdiction, did not exceed its legitimate powers, and did not clearly err when it denied Governor Justice's motion to dismiss Mr. Sponaugle's petition for writ of mandamus. Therefore, we deny the requested writ to prohibit enforcement of the Circuit Court of Kanawha County's October 21, 2019 order.

Writ denied.

---

appeal." *State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996). *Accord State v. Adkins*, 209 W. Va. 212, 216 n. 5, 544 S.E.2d 914, 918 n. 5 (2001); *State v. Easton*, 203 W. Va. 631, 642 n. 19, 510 S.E.2d 465, 476 n. 19 (1998); *State v. Lilly*, 194 W. Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) (noting that "appellate courts frequently refuse to address issues that appellants . . . fail to develop in their brief.").

*State v. Kaufman*, 227 W. Va. 537, 555 n. 39, 711 S.E.2d 607, 625 n. 39 (2011).

36